THE STATE v. GRANT MATHIS, Appellant.

Division Two, November 19, 1907.

1. **GAMBLING: Keeping Table: Poker.** The setting up and keeping of tables on which poker is played is in violation of the statute (Laws 1901, p. 130). That statute prohibits the setting up or keeping of "any kind of gambling table or gambling device, adapted, devised and designed for the purpose of playing any game of chance for money or property," and the inducing, enticing or permitting "any person to bet or play at or upon any such gaming table or gambling device, or at or upon any game played or by means of such table or gambling device." It makes no difference whether the table on which the game of poker was played was a gambling device or not, or whether "poker" or "poker table" is specifically mentioned in the statute or not, or whether the table used was specially adapted, devised and designed for the purpose of playing poker; if the table used was a table adapted, devised and designed for the purpose of playing any game of chance for money or property, and defendant permitted any person to bet or play upon such table, he is guilty of setting up and keeping a table or device, etc., in violation of the statute.

2. ————: ————: ————: **Proof.** That a poker table is adapted and designed for the purpose of playing games of chance is shown by the fact that games of poker were played thereon. And so of a table on which the game called "craps" is played.

3. ————: ————: ————: **Cards: Dice.** Although cards or dice may be necessary to be used in conjunction with a table or other device in order to play a game of poker or other game of chance, the table or device is none the less one denounced by the statute.

4. ————: ————: **Crap Table.** Whether the table used was specially adapted, devised and designed for the purpose of playing the game called craps, for money or property, is immaterial, so long as it was used for such purpose. If the evidence shows that the game of craps was played on a table set up or kept by defendant, and that he permitted persons to bet at or play at such table, the table was such as the statute forbids him to set up or keep.

Appeal from Newton Circuit Court.—*Hon. F. C. Johnston*, Judge.

AFFIRMED.

*Clay & Sheppard* for appellant.

(1)   The court erred in admitting evidence that tended to show that defendant was conducting a poker game. Laws 1901, p. 130. "Where a statute enumerates particular classes of persons or things, followed by general words, the general words will be limited in their meaning and restricted in their operations to objects of like kind with those specified." State v. Schuchmann, 133 Mo. 111; State v. South, 136 Mo. 673. A poker table is not mentioned in this section, it is not prohibited by the general provision, for the rule as to matters *ejusdem generis* applies. Bish., Stat. Cr. (2 Ed.), secs. 193, 194, 227.   (2)   The game of poker could not be played by means of a table alone, but the thing that is adapted, devised and designed for the purpose of playing a game of poker is an ordinary deck of playing cards, and this court has expressly held that ordinary playing cards are not such a device as are prohibited by this statute. State v. Gilmore, 98 Mo. 206; State v. Etchman, 184 Mo. 193. (3)   The court erred in admitting evidence tending to show that a crap game was being conducted in the Belmont Block without requiring the State to show that the same was being conducted upon a crap table, which was adapted, devised and designed for the purpose of playing a game of craps and that the table was set up or kept by defendant and that he enticed or permitted persons to bet at or play upon said table. There was no evidence whatever that the game of craps was being played upon a table commonly called a crap table. State v. Gilmore, 98 Mo. 211. The prohibition of section 1547 (now 2194) does not apply to games but to devices, and is limited to devices "adapted, devised and designed for the purpose of playing a game of chance." State v. Fulton, 19 Mo. 680; State v. Rosenblatt, 185 Mo. 123; State v. Gilmore, 98 Mo. 211.

*Herbert S. Hadley,* Attorney-General, and *N. T. Gentry,* Assistant Attorney-General, for the State.

The tables used were poker tables and crap tables, respectively, designed and devised specially for those games; and the games played on them were poker and craps, respectively—the defendant and his guests betting on said games for money. State v. Rosenblatt, 185 Mo. 114; State v. Miller, 190 Mo. 449; State v. Cronin, 189 Mo. 663; State v. Locket, 188 Mo. 415; State v. Davis, 102 S. W. 528; State v. Holden, 102 S. W. 490.

BURGESS, J.—At the April term, 1906, of the circuit court of Newton county, the defendant was convicted of the crime of setting up and keeping divers gaming tables and gambling devices, to-wit, two poker tables and one crap table, which were adapted, devised and designed for the purpose of playing games of chance for money and property. The conviction was under the second count of an indictment charging defendant with said offense, and the punishment assessed was five years in the penitentiary. After filing unsuccessful motions for a new trial and in arrest of judgment, the defendant appealed.

The evidence on the part of the State tended to prove that there was a building known as the Belmont Block situated in the city of Neosho, Newton county, Missouri, and that in the summer of 1905 there were two upstairs rooms in said building which defendant occupied and called his office. One witness, Lou Ellis, did some work for the defendant and visited his home for the purpose of collecting the money owing him for said work. Defendant told him to come to his office and get paid. Witness went to said Belmont Block building, where he was directed to the office of the defendant. He found the door locked, but the defendant unlocked it and admitted him. There was an-

other man besides the defendant in the room. In that
room were three tables, one square-shaped and two
round tables, each having a canvas cover. After being
paid the amount of his bill, Ellis engaged in a game
of poker with defendant and the other man, and re-
mained there seven hours. Ellis bought five dollars'
worth of poker chips from the defendant, paying him
money therefor, and after losing on the game he again
bought five dollars' worth of chips. Losing the second
time, he bought ten dollars' worth of chips from the
defendant, which he also lost. At various times, dur-
ing the progress of the game, Ellis heard knocks at
the door. Each time, the defendant got up, went to
the door and peeped through the keyhole, but did not
allow anybody to enter. The poker table at which Ellis
and his companions played had a drawer in it and
also a slot on the top, through which slot chips were
dropped into the drawer by players at the game, the
chips dropped through becoming the operator's "rake-
off." Witness Ellis also testified that during the game
that they there played, defendant sat on one side of
the poker table, about where the drawer was, and that
Ellis and the other man sat on the other side of the
table opposite the defendant. That the defendant kept
the chips and decks of cards in the drawer, and that
the defendant had charge of the decks and also charge
of the chips. He further testified that they used the
chips to bet with instead of money, and that after the
game was over the chips were cashed, the defendant
cashing the same.

Elbert Oliver, a boy of nineteen, testified that he
knew the defendant and had visited his place of busi-
ness in the Belmont Block along in the summer of
1905, and that he met the defendant and several others
in those upstairs rooms at night. He further testified
to the fact that the door was locked and that some one
on the inside responded to his knock. On that night

this witness, the defendant and others played a game of craps on one of these tables, using dice and betting money.

John Pickins, a boy of fifteen, testified that he, too, visited the defendant's apartments in the Belmont Block and saw men shooting craps there on a table, using dice. He said nobody invited him to go up there; he "just followed the gang." After the proper knock was made on this door, some one from within unlocked it and let them in. This witness lost thirty-five cents on the game of craps, which he said was played on a table that had black oil-cloth, or something of that kind, over the top.

The city marshal of Neosho, Mr. B. J. Peraman, and Sheriff John B. Beavers raided the Belmont Block one night in the summer of 1905, but before forcing an entrance they climbed up in a chair and peeped in over the transom. They saw the defendant, Elbert Oliver, Claude Flemming and others in the room gambling and shooting craps. The defendant was sitting on one side of the table and the others were sitting on the other side of the table, facing him, rolling dice and throwing money on the table. There were three tables in the room and each one had a cloth cover. Two of the tables were covered alike, but one had a white cover. After watching this for a little while, the officers went away and came back later that night. By this time the defendant and his associates were making considerable more noise. The officers heard the dice and money falling upon the table, and the defendant and two of his friends were still seen standing around the tables. In the drawers of these tables were found thirteen decks of cards and a number of poker chips. The sheriff called out, "Boys, I see you," and asked that the door be opened. After making further demands for the door to be opened, and kicking on the door several times, it was unlocked, and the

sheriff and marshal entered. There was only one man in the room where the tables were. But on going through into another room and back into a closet, the defendant and several of his friends were found. Two of the tables were round and one was a square table. The round tables were what were known as poker tables. The other table was the kind used to shoot craps on.

The defendant offered no evidence, but asked for an instruction in the nature of a demurrer to the evidence introduced by the State, which instruction the court refused to give, and defendant excepted.

The indictment charges that' on the — day of September, 1905, Grant Mathis, in the county of Newton and State of Missouri, did unlawfully and feloniously set up and keep divers gaming tables and gambling devices, to-wit, two poker tables, commonly so called, one crap table, commonly so called, upon which dice and cards were used, which said gaming tables and gambling devices were adapted, devised and designed for the purpose of playing games of chance for money, property and poker chips, and did then and there unlawfully and feloniously entice and permit divers persons, to the grand jury unknown, to bet and play at and upon and by means of said gaming tables and gambling devices.

The indictment is drawn under section 2194, Revised Statutes 1899, as amended by the Act of 1901, Laws 1901, p. 130, which is as follows:

"Every person who shall set up or keep any table or gaming device commonly called A B C, faro bank, E O, roulette, equality, keno, slot machine, stand or device of whatever pattern, kind or make, or however worked, operated or manipulated, or any kind of gambling table or gambling device adapted, devised and designed for the purpose of playing any game of chance for money or property, and shall induce, entice or

permit any person to bet or play at or upon any such gaming table or gambling device, or at or upon any game played or by means of such table or gambling device or on the side of or against the keeper thereof, shall, on conviction, be adjudged guilty of a felony, and shall be punished by imprisonment in the penitentiary for a term of not less than two nor more than five years, or by imprisonment in the county jail for a term not less than six nor more than twelve months.''

Defendant's first insistence is that it is no offense, under said section of the statute, to set up and keep a poker table, and to entice or permit persons to play at or upon the same, for the reason that a poker table is not specifically mentioned in the statute, nor prohibited by the general provision.

In State v. Rosenblatt, 185 Mo. 114, the accused was indicted under this same statute, and convicted of the offense of setting up and keeping a crap table. The contention of the defendant was that the indictment did not charge the ''setting up or keeping'' any of the tables or gambling devices denounced by the statute; that instead of charging the setting up and keeping a roulette *table* it charged the setting up and keeping of a roulette *wheel,* and did not specify either of the gambling devices specified in said section. Upon this proposition GANTT, J., speaking for the court, said:

''The statute is broad enough to and does include the setting up or keeping 'any kind of gambling table or gambling device adapted, devised and designed for the purpose of playing any game of chance for money or property,' and this indictment specifically charges that the defendant did set up and keep one *crap table,* commonly so called, upon which dice are used, and one *chuck-a-luck* table, commonly so called, upon which are used dice, 'which said gaming tables and gambling devices were adapted, devised and designed for the

purpose of playing games of chance for money and property,' etc.

" 'Chuck-a-luck' and 'craps' are not named, and therefore do not have a legal signification within the meaning of the statute, but if prohibited at all, must come within the general prohibition of the section. Conceding that all other gambling tables and devices not specifically named must, under the doctrine *ejusdem generis,* be of the same general class with those devices specifically named, we think there can be no doubt that a chuck-a-luck table and a crap table are of that class.

"It was so ruled of 'keno' under a statute of Arkansas substantially in the words of section 2194. [Gould's Digest of Arkansas, sec. 1, art. 3, chap. 51; p. 369; Portis v. State, 27 Ark. 360; Trimble v. State, 27 Ark. 355.] Also of 'pico.' [Euper v. State, 35 Ark. 629.] In Bell v. State, 32 Tex. Crim. Rep. 187, a 'crap table' was held to be a gambling device within the statute of that State against keeping or exhibiting, for the purpose of gambling, a gaming table or bank. A like ruling was made as to a 'nickle-in-the-slot machine' by the Supreme Court of Georgia in Kolshorn v. State, 97 Ga. 343. [See, also, Mims v. State, 88 Ga. 458.]"

That case was approved and followed in State v. Locket, 188 Mo. 415. The cases of State v. Gilmore, 98 Mo. 206, and State v. Etchman, 184 Mo. 193, are not in conflict with those cases.

Counsel for defendant lay much stress upon the fact that the game of poker does not require a table or device of a certain kind, and specially adapted, devised and designed for the playing of the game of poker alone. Nor was it necessary that the table should be *specially* adapted, devised and designed for the purpose of playing poker alone. The statute should not be given any such restricted meaning. It prohibits the setting up or keeping "*any kind of gambling table or*

*gambling device,* adapted, devised and designed for the purpose of playing any game of chance for money or property,'' and the inducing, enticing or permitting "any person to bet or play at or upon any such gaming table or gambling device, or at or upon any game played or by means of such table or gambling device,'' always putting it in the disjunctive. It makes no difference whether the table on which the game of poker was played was a gambling device or not; if it was a table, adapted, devised and designed for the purpose of playing any game of chance for money or property, and the defendant permitted any person to bet or play upon such table, he is guilty as charged. That the poker table, so called, was adapted and designed for the purpose of playing games of chance is clearly shown by the fact that games of poker were played thereon, in some of which at least the defendant participated.

A further contention is that the game of poker cannot be played by means of a table alone, but that the thing that is adapted, devised and designed for the purpose of playing such game is an ordinary deck of playing cards. The primary object of the statute was to prevent gambling, by prohibiting the setting up or keeping any kind of table or gambling device for the purpose of playing any game of chance for money or property, and although cards or dice may be necessary to be used in conjunction with such table or device in order to play such game of chance, it is none the less a gambling table or device when used in conjunction with cards or dice for the purpose of playing a game of chance for money or property. [State v. Rosenblatt, supra; State v. Locket, supra.]

It is next insisted that the court erred in admitting evidence tending to show that a crap game was being conducted in the building known as the Belmont Block, without requiring the State to show that the game was

being played on a crap table, adapted, devised and designed for the purpose of playing the game of craps, and that the table was set up or kept by the defendant and that he enticed or permitted persons to bet or play upon it. The evidence was conclusive that the game of craps was played on a table set up or kept by defendant, and that he permitted persons to bet at or play upon said table. Whether such table was specially adapted, devised and designed for the purpose of playing the game called craps, for money or property, is immaterial, so long as it was used for such purpose, what we have already said with respect to the poker table applying with equal force to this proposition.

Other questions are raised by defendant, but as they seem to be without merit we do not feel it necessary to pass upon them.

Finding no reversible error in the record, the judgment is affirmed. All concur.