## THE STATE v. MONT HALL, Appellant.

### Division Two, May 26, 1910.

1. GAMBLING DEVICE: Poker Table: Amendment of Statute. The amendment of 1901 to Sec. 2194, R. S. 1899, by which the words "slot machine, stand or device of whatever pattern, kind or make however worked, operated or manipulated" are added, in no way limits the meaning of section 2194, but those words were intentionally added for the purpose of covering every kind of a gambling table or gambling device adapted, devised or designed for the purpose of playing any game of chance for money or property, when the person setting up or keeping the same induces, entices or permits persons to bet and play at and upon the same. And where defendant and another set up a table in a room of defendant's hotel, and furnished it with cards and chips upon which divers persons were induced, or at least permitted, to play poker for money, or chips bought from them, and such other took his rakeoff from the winners and divided the proceeds or the "kitty" equally with defendant, their action was a violation of the statute, and no demurrer to the evidence should have been sustained.

2. ———: Instruction: Designed for Poker. It is not necessary that the court, in its instructions, require the jury to find that the table, used in playing poker, was specially adapted, devised and designed for the playing of poker. If it was a table adapted, devised and designed for the playing of any game of chance for money or property, and defendant set it up and maintained it, and induced or permitted others to bet or play thereupon, he is guilty.

3. ———: ———: Inducing Others to Play. If the testimony shows that defendant introduced his friends to the manager of the room in defendant's hotel, that he played himself and some-

State v. Hall.

times had charge of the game and shared in the proceeds taken from the winners, the instruction should authorize the jury to find defendant guilty if he "induced or permitted" divers persons to bet and play thereon.

4. ———: **Playing Cards: Instruction.** The instruction as asked told the jury that "ordinary playing cards are not a gambling device," and the court modified the instruction to read that "ordinary playing cards are not of themselves alone a gambling device." *Held*, that the meaning of the instruction was not changed by the modification.

Appeal from Newton Circuit Court.—*Hon. B. G. Thurman*, Judge.

AFFIRMED.

*W. Cloud* and *O. L. Cravens* for appellant.

(1) The demurrer to the evidence should have been sustained, because the table was not adapted, devised and designed for poker playing in the manner that gambling was done upon it, and such was the trial court's view of the law as outlined in instruction 7. The table and slot device were entirely covered with cloth. The mere fact that this table was used does not make it a gambling device. Cards themselves have been held to be not a gambling device under the section under which this information is drawn, though they must be used in playing poker. The table used must be something more than an ordinary table, and the devices themselves must be employed. The use of the word table, a general word, or gambling table, in the statute, is controlled by, and limited to, the specific and special kinds of tables and gambling devices used in connection therewith, as a roulette table, keno table, etc. Above and beyond all, it must be a gambling table. Under the *ejusdem generis* rule common tables are excluded, as are likewise tables with gambling devices where such devices are not employed in the game. State v. Gilmore, 98 Mo. 206; State v. Bryant, 90 Mo.

534; State v. Mann, 2 Ore. 238.   Before defendant can legally be convicted for complicity, the gambling device must be A B C, faro bank, E O, roulette, equality or keno, and no others, under the ruling in the Gilmore case.   The mere setting up, or keeping for playing, of poker chips representing money, with ordinary playing cards, on a table, are not acts prohibited by the statute.   And the setting up of a poker table on which are used poker chips and cards for gaming, is expressly held not to be within its prohibition.   State v. Etchman, 184 Mo. 200; Miller v. U. S., 6 App. D. C. 6; Gillen v. State, 55 S. W. (Tex.) 48; Tully v. State, 114 S. W. (Ark.) 920; State v. Hamilton, 67 Atl. (Del.) 836.   State v. Mathis, 206 Mo. 604, does not conflict with our position.   It is not contended by the State that defendant ''set or kept'' the gambling devices in question, but only that he permitted Thompson to do so.   This does not make a case, and defendant should have been acquitted peremptorily.   O'Blennis v. State, 12 Mo. 311.   The defendant was tried on the theory that he was an accomplice with Thompson. But Thompson does not make a case against defendant under section 2194.   The mere fact that these two were to run a gambling house and divide the winnings, does not entitle the State to convict under 2194.   This is the whole case.   It is nothing else but that.   The only common purpose between the parties, reasonably inferable from any proof in the case, was to run a common gambling house.   Such is in substance what Thompson shows so far as the defendant is concerned.   That was the only crime which he aided, abetted or assisted in, or of which he could have been legally convicted.   State v. Gilmore, 98 Mo. 206; Nuckolls v. Com., 32 Gratt. 884; State v. Hardin, 1 Kas. 474.   The only conspiracy or common design proved was to run a gambling house and divide the winnings.   This shows nothing in violation of section 2194, but does prove a violation of section 2197.   The conviction ought not stand on proof

of any acts by Thompson outside the common design. If he went further, and did other acts which amount to a crime under 2194, defendant cannot be convicted thereon. State v. May, 142 Mo. 135. (2) There is a total absence of proof showing that defendant "induced or enticed" any one to bet or play upon this table. It is true Thompson says that defendant "introduced" his friends there sometimes; that he played himself and sometimes had charge of the game. But this, while perhaps authorizing a submission of the question, along with the other evidence, as to whether defendant "permitted" playing, does not establish nor tend to establish, in even a remote degree, that defendant "induced or enticed" anyone to play. No evidence was offered as to inducing or enticing by defendant. The circumstances attending the alleged introduction of his friends into the room were not shown, and ought not to be guessed at by the jury. State v. Johnson, 111 Mo. 578; State v. Little, 67 Mo. 624; State v. Tice, 90 Mo. 112; State v. Weaver, 165 Mo. 1; State v. Callaway, 154 Mo. 91; State v. Bonner, 178 Mo. 424.

*Elliott W. Major,* Attorney-General, and *John M. Dawson,* Assistant Attorney-General, for the State.

(1) The court did not commit error in overruling the demurrer to the State's evidence, because there was ample evidence for the State that appellant was one of the keepers and proprietors of room 12 in the De Mont Hotel, and received one-half of the take-off, proceeds and winnings of the games played upon the table, and that the gambling device—the table—came within the provisions of the statute. State v. Rosenblatt, 185 Mo. 114; State v. Mathis, 206 Mo. 604. The Gilmore case, 98 Mo. 206, cited by appellant, is not in point. The prohibition in our statute includes "the setting up and keeping any kind of gambling table or gambling device adapted, designed and devised for the

purpose of playing any game of chance for money or property.'' State v. Rosenblatt, 185 Mo. 114; State v. Mathis, 206 Mo. 610; Kelly's Crim. Law, sec. 950; R. S. 1899, sec. 2194; State v. Locket, 188 Mo. 418. (2) The evidence showed that there were games of chance played upon the table for money, that appellant was one of the keepers of the table, and that at the time of the raid by the sheriff a game was being played by eight persons who were caught in the act. The evidence of Thompson is uncontradicted as to the fact that appellant was a full partner in the business. (3) This court has often held that where there is substantial evidence to show the guilt of the accused, it will not attempt to weigh the evidence, but will adhere to the finding of the jury. State v. Smith, 190 Mo. 706; State v. Groves, 195 Mo. 452; State v. Matthews, 202 Mo. 148; State v. Tetrick, 199 Mo. 100.

GANTT, P. J.—On March 24, 1909, the prosecuting attorney of Newton county filed an information with the clerk of the circuit court of said county, charg-- ing the defendant with having on the——day of Feb- ruary, 1909, at the county of Newton, unlawfully and feloniously set up and kept a certain gambling table and gambling device, to-wit, one poker table, commonly so called, upon which cards, commonly called play- ing cards, were used, which said gaming table and gambling devices were adapted, devised and designed for the purpose of playing games of chance for money, property and poker chips, and unlawfully and felon- iously induced and permitted divers persons to bet and play at and upon and by means of said gaming table and gambling devices.

A change of venue was granted from the judge of the circuit court of Newton county, on account of al- leged prejudice on the part of said judge against the defendant, and Honorable B. G. Thurman, judge of

the Twenty-sixth Judicial Circuit, was selected to try the case.

The defendant was duly arraigned and entered his plea of not guilty and was put upon his trial on the 21st of October, 1909, and convicted, and his punishment assessed at two years in the penitentiary.

The evidence tended to show that the defendant was the owner of the DeMont Hotel at Seneca in Newton county, and had lived in said town since 1876; that in the fall of 1908, one R. C. Thompson, a professional gambler, who had gambled in Kansas and Oklahoma continuously for eight years last past, went to the defendant and arranged for room number twelve in his hotel. This room number twelve had been three years previous to this time occupied by a man by the name of Dan Stuckey, who had built and left in the room a gambling table with a slot or slide on top, in which the gamblers would deposit checks, which was called the bank or take-off of the person running the house. Dan Stuckey also left in this room about one hundred decks of common playing cards and divers red, white and blue poker chips. Thompson used this gambling paraphernalia, but the evidence was that this table had been covered by a cloth, and the slot or slit was not used, but Thompson in playing the game, instead of adding his chip, would not *ante* and kept his *ante* out as pay for the use of the room, which was called the "kitty" or "take-off," and that defendant and Thompson would divide the proceeds, or what Thompson would win in the game and the "kitty," equally. Thompson sold checks to the players as follows: the blue at $1.25, white at five cents, and the red at twenty-five cents, and the players would use these chips as money, and when the game was over any of the players having chips had them cashed by Thompson at the same price at which he sold them. If Thompson was not present to attend to the business, the defendant would do it. The door by which they entered the room

number twelve was fastened by a spring lock, to which there were two keys, one of which was carried by Thompson and the other by the defendant. On February 9, 1909, the sheriff of Newton county raided this room and found nine persons and arrested eight of them. The defendant was the owner of all the gambling paraphernalia.

The evidence on the part of the State tended to show that games of poker for money were often played in this room from the time Thompson formed this partnership with the defendant in September, 1908, until the day of the raid by the sheriff. The evidence also tended to show that the defendant spent a large part of his time in this room. The usual custom was to sell two dollars' worth of chips to the players to start with, and if they wished more afterwards they could buy as many as they wished. That draw poker was the usual game played in that room. The game of draw poker was fully explained and described in the evidence, but it is not deemed necessary to repeat the description in this statement. The chips, playing cards and table were all offered in evidence before the court and jury.

The defendant testified in his own behalf that he lived at Seneca and had lived there since 1876; that he was the proprietor of the DeMont Hotel; that Dan Stuckey had boarded with him and occupied room number 22 then, but they had since changed the numbers, and it was now numbered twelve, and when he went away he left in the room these poker chips, cards and this table; that the defendant did not own or claim them; that Thompson was a guest in his hotel, came there in August, 1908. Thompson sent Norman Mitchell to see him about coming there; defendant said he did not want to talk to Thompson; that he never made any arrangements with Thompson to divide the profits or winnings in the poker games. Thompson was a high liver and a good spender. He spent a good deal of

money around the hotel buying fruit, candies and at the lunch counter. Thompson had one key to the room and defendant the other. Defendant had never had anything at all to do in conducting any game since Thompson came there; had never received any money for checks or paid any money or cashed any checks as keeper or runner of the game. He never invited, solicited or induced anybody to come and play in the room. On cross-examination he testified that he had a number of rooms in his hotel for guests; that the cards, tables and chips in evidence had remained in the room and the table was used to set and pile things on; that Thompson paid for his room and stayed there a good deal of the time; that witness did not know that the boys were gambling much, he himself had been there and played for fun; that on the night of the raid he heard Collier, the sheriff, going upstairs and he followed to investigate. He did not recognize Collier and he wanted to see what he was doing up there; that the boys in this room had rooms upstairs in the hotel; that the lock on the door of number twelve was a Yale lock; that there was no gambling in this room to amount to anything; that Thompson had offered to give him half the profits and winnings, but he refused and would not let him have it that way.

I. This is a prosecution under the Act of March 19, 1901, amending section 2194 of the Revised Statutes of 1899, by which the words "slot machine, *stand* or device of whatever pattern, kind or make however worked or operated or manipulated" are added to said section 2194. The defendant insists that his demurrer to the evidence entitled him to an acquittal and that the court erred in not so directing.

The credibility of the witnesses and the weighing of the evidence were matters for the jury to determine. If the jury believed the witness Thompson, they were justified in finding that the defendant furnished the

room and the table, cards and poker chips and together with Thompson was running regularly a poker table on the day laid in the indictment, and received one-half of the take-off, proceeds and winnings of the game played upon the said table, and that he brought different men to the room and introduced them to Thompson, who was the regular manager of the game, and that in the absence of Thompson the defendant himself managed it. From this state of facts the question arises, was this poker table so adapted, devised and designed for the purpose of playing poker thereon for money or property and the permitting divers persons to bet and play at and upon it for money or property, a setting up and keeping of a gambling device or gaming table within the meaning of the statute as amended in 1901?

The learned counsel for the defendant earnestly insists that under the Gilmore case, 98 Mo. 206, it was not a violation of this statute. That the facts in this case clearly differentiate it from those in the Gilmore case, we think is obvious. In that case the defendant was the proprietor of a saloon and furnished the persons who came to his saloon cards and chips or checks, and they played such games as seven up, euchre and poker on the ordinary wine and lunch tables which he kept in his saloon; the defendant did not participate in such game, nor play with anybody against any of the players, but the players bet their money against each other, and not on the side of, or against, the defendant therein, who took no part in the games, either directly or indirectly; the cards and chips used were handed out from behind the bar, only to such persons as requested them; the defendant did not have the care or management of the cards or chips or the games played, and had nothing to do with the cards or chips further than to give them to such persons as called for them; he would sell the chips to the players at five cents each when they commenced the game and

when they quit he would redeem the chips that each
one had at the rate of five cents apiece; and there was
no rake-off whatever to him.  It was ruled in that case
that a pack of playing cards was not a gambling device
within the meaning of section 1547 of the revision of
1879, which was in effect the same as section 2194, Re-
vised Statutes 1899.  Whereas the evidence in this case
demonstrates, at least for the purposes of this appeal,
under the verdict of the jury, the defendant was the
owner of a room in his hotel, to-wit, he and Thompson
alone carried the keys and he was the owner of the
cards, table and the poker chips which were used in
carrying on poker games in that room.  In a word, this
room was used as a gambling room by Thompson and
the defendant.  Thompson or the defendant in playing
the game, instead of adding his chip, would not *ante,*
but would keep his *ante* out as pay for the use of the
room or as a "kitty" or "take-off," and defendant
and Thompson divided the proceeds of Thompson's
winnings and the "kitty" equally.  As said by this
court in State v. Fulton, 19 Mo. 680, "It was not the
losing of money or property that the Legislature in-
tended here to punish, but it was to prevent any per-
son from keeping or setting up any gambling device or
gaming table adapted, devised and designed for the
purpose of playing games of chance for money or prop-
erty, and inducing, enticing or permitting persons to
play at or bet on such table.  The crime was in setting
up or in keeping such a gambling device, and permit-
ting persons to bet or play at such table or gambling
device."

In State v. Rosenblatt, 185 Mo. 114, it was ear-
nestly insisted that a crap table and a chuckaluck ta-
ble were not such devices as contemplated by the stat-
ute, but it was held that the statute was broad enough
to and did include the setting up and keeping any
kind of gambling table or gambling device adapted, de-

228 Sup—30

vised and designed for the purpose of playing any game of chance for money or property, and that while chuckaluck and craps were not named, they were clearly *ejusdem generis* with those specified in the act. Afterwards in State v. Mathis, 206 Mo. 604, the indictment charged the setting up and keeping of divers gaming tables and gambling devices, to-wit, two poker tables, commonly so called, and one card table, which said gaming tables and gambling devices were adapted, devised and designed for the purpose of playing games of chance for money, property and poker chips, and that defendant did feloniously induce and permit divers persons to bet and play at and upon the same, and it was earnestly insisted that poker tables were not within the meaning of the statute; that the game of poker did not require a table or device of a certain make and specially adapted, devised and designed for the playing of the game poker alone. But Judge BURGESS, speaking for this court, said: "Nor was it necessary that the table should be specially adapted, devised and designed for the purpose of playing poker alone. The statute should not be given any such restricted meaning. It prohibits the setting up or keeping 'any kind of gambling table or gambling device adapted, devised and designed for the purpose of playing any game of chance for money or property,' and the inducing, enticing or permitting 'any person to bet or play at or upon any such gaming table or gambling device, or at or upon any game played by means of such table or gambling device,' always putting it in the disjunctive. It makes no difference whether the table on which the game of poker was played was a gambling device or not; if it was a table adapted, devised and designed for the purpose of playing any game of chance for money or property, and the defendant permitted any person to bet or play upon such table, he is guilty as charged. That the poker table, so called, was adapted and designed for the purpose of playing games

of chance is clearly shown by the fact that games of poker were played thereon, in some of which, at least, the defendant participated.'' In State v. Locket, 188 Mo. 415, the contention was that a table and a gambling device, to-wit, a pair of dice, was not a gambling device under section 2194. Judge Fox, speaking for this court, repeated with approval what was said in State v. Rosenblatt, 185 Mo. 114, and held that the statute was broad enough to include such a device.

The foregoing decisions on this question were rendered in construing section 2194 without reference to the amendment of 1901, which amendment appears not to have been called to the attention of the court, but certainly the words added by that amendment, to-wit, ''slot machine, stand or device of whatever pattern, kind or make or however worked, operated or manipulated,'' in no way limit the meaning of the section prior to its amendment, but were intentionally added for the purpose of covering every kind of a gambling table or gambling device adapted, devised and designed for the purpose of playing any game of chance for money or property when the person setting up and keeping the same induces, entices or permits persons to bet and play at and upon such gaming table, or gambling device, or at or upon any game played on or by means of such table or gambling device or on the side or against the player thereof. Keeping in view the broad language of the statute and the purpose for which it was enacted, so well stated by Judge RYLAND in State v. Fulton, 19 Mo. 680, we are unable to distinguish a case in which a person set up and maintained a table for the playing of craps for money or property and a table set up as the table in this case was by the defendant and Thompson, and furnished with cards and poker chips, upon which divers persons were induced or at least permitted to play poker for money or property and the keeper thereof took his regular rake-off from the winners. We think the statute is broad enough

to include the setting up and keeping a poker table in such manner and under such circumstances, and the circuit court did not err in overruling the demurrer to the evidence interposed by the defendant. Neither are we able to see the difference between this case and the case of State v. Mathis, supra, which is urged by counsel for the defendant. The fact that in the latter case the chips were dropped into the drawer by the players of the game for the proprietor's rake-off does not differ in principle from the device resorted to by Thompson and the defendant in keeping out their *antes* or take-offs in the first instance. The evidence in both cases established that the defendants had set up and were keeping this game for their own profit and were inducing and enticing and permitting others to play at and upon said tables, and the evil which the statute designed to prevent was accomplished alike in both cases.

II. We do not think there was any prejudicial error committed in permitting Stuckey to explain the use and operation of the table slot as it was originally constructed, as it was developed in his testimony that the slot was covered by a cloth at the time of this raid. Moreover, the court fully instructed the jury on that matter, that, although they might find that it had devices and was designed and adapted as originally constructed to be used as a poker table, yet if it was so covered that such device could not be and was not so used, the defendant was entitled to acquittal.

III. An exception was saved to the giving of the first instruction by the court, for the reason that appellant's counsel claim there was no proof that this table as used was specially adapted, devised and designed for the purpose of playing poker. The court did not require the jury to find that the table was specially designed for the purpose of playing poker, nor was it

necessary, as was said by this court in State v. Mathis, 206 Mo. l. c. 610.

It is also objected to this instruction that there was no evidence that the defendant induced or enticed any one to play upon the table. The instruction authorized the jury to find the defendant guilty if he induced or permitted divers persons to bet and play upon said gambling table and Thompson testified that he introduced his friends there; that he played himself and sometimes had charge of the game. Under these circumstances this objection to the instruction is, we think, not meritorious.

Again it is insisted that instruction number one conflicts with instruction number seven.

Of course, it is elemental that all the instructions are to be considered together. Instruction seven was given on behalf of the defendant, and told the jury that before they could convict the defendant they must find and believe from the evidence that the table in question was adapted, devised and designed for the purpose of playing poker, and unless they so found and believed they should acquit the defendant, and although they might find that it had devices and was designed and adapted as originally constructed for use as a poker table, yet, if the same was so covered that such device could not be and was not used, then in that event they should acquit the defendant. There is no conflict in the two instructions, and instruction number seven was not equivalent to a peremptory instruction to acquit the defendant, as the jury under the two instructions were left free to find under the evidence that, notwithstanding the cloth covered the slot, the table was still designed and adapted to the playing of poker thereon.

IV. Complaint is also made that the court modified instruction number nine requested by the defendant in these words: "The court instructs the jury that

ordinary playing cards are not a gambling device within the charge against defendant herein." The court modified this instruction so as to make it read: "The court instructs the jury that ordinary playing cards *of themselves alone* are not a gambling device within the charge against the defendant herein."

We are unable to see wherein the instruction conveyed any different idea after this modification from what it did prior thereto. After all, it simply tells the jury that ordinary playing cards are not a gambling device under this statute, and the defendant had the full benefit of that instruction and having prayed for it had no cause to complain of it.

As to the other instructions no complaint is made of them, and we have read them carefully and they are as favorable to the defendant as the law would justify.

The jury having been properly instructed and there being sufficient evidence if believed by them to sustain the charge in the indictment, it is not the province of this court to interfere therewith. Accordingly the judgment must be and is affirmed. All concur.