[No. 6549.]

## EVERHART v. THE PEOPLE.

1. GAMBLING—*Statute Construed*—Under section 1791, 1792 of the Revised Statutes neither the keeping of gambling devices nor playing a game is prohibited, but only gaming for money or property, or betting upon the result of a game.

A game is any sport or amusement, and includes physical contests, whether of man or beast.

Gaming is the risking of money or property on a contest of chance, skill or hazard, wherever one must win and the other lose.

Horse-racing is gaming, and a wager on the result of a horse-race is within the words of the statute, "any game whatsoever."

The statute prohibits gambling, the keeping of a place where gambling is commonly carried on, the keeping at such place, and exhibiting of gambling devices, and the betting of money or other property upon the result of any game.

Gambling devices as used in the statute include any device or apparatus kept or used for gambling.

One who, at a race meeting, had a space adjoining the grand stand, a blackboard upon which were entered the names of the horses competing, received bets upon the races, and issued cards recording the bet, upon the presentation of which after the race he paid the sums won, was declared to be guilty of keeping a gambling table, establishment, device or apparatus.

The territorial act of 1867 (Laws 1867, 114) is not a legislative construction of the statute against gambling. It simply suspended for one day in each year, at a certain place, the operation of the statutes against gambling, as to certain specified acts thereby prohibited.

2. STATUTES—*Construction*—Where identical words occur in different parts of a statute the same meaning is to be ascribed to them in each case, unless it clearly appears that a different meaning was intended, e. g., "game," "gaming," and other like words in the different sections of the criminal code against gambling are to be received in the same sense. *Corson v. Neatheny,* 9 Colo. 212, approved and followed.

3. DORMANT STATUTE—Things clearly prohibited do not become lawful by the failure, for many years, to enforce the legislative will.

*Error to Denver District Court.*—Hon. GEORGE W. ALLEN, Judge.

Mr. T. J. O'DONNELL, Mr. EDWIN H. PARK, Mr. JOHN W. GRAHAM, Mr. JOHN A. RUSH, Mr. CALDWELL YEAMAN and Mr. J. D. BENEDICT, for plaintiff in error.

Hon. BENJAMIN GRIFFITH, attorney general, and Mr. CHARLES O'CONNOR, first assistant attorney general, for the people.

Mr. JUSTICE WHITE delivered the opinion of the court:

An information in two counts was filed against plaintiff in error, upon which he was tried and convicted. The first count was under section 1791, R. S., 1908, and charged that he "unlawfully did keep and exhibit a certain gaming table, establishment, device and apparatus, * * * to win and gain money by gambling," etc. The second count was under section 1792, R. S., 1908, and charged that he "unlawfully did play at a game for a sum of money or other property of value, and did make a bet and wager for a sum of money or other property of value, upon the result of such game," etc.

The proven or admitted facts are: that plaintiff in error made books and sold pools upon certain horse races held under the auspices of the Overland Jocky Club at Overland Park race tracks, in the city and county of Denver on a certain day. Preceding the running of each race the plaintiff in error entered the names of the horses competing in the race, upon a blackboard placed upright upon a table or platform prepared for that purpose, adjoining the grand stand at the race tracks; and, in conjunction with others employed for the purpose, received the money bet upon the races, giving in exchange therefor cards upon which was recorded the bet; and, after the result of each race, paid the sums won to the winners, upon presentation and surrender of the cards, keeping the balance,

Much of the argument of counsel is predicated upon the assumption that in order to sustain the judgment of conviction, it is essential to hold that horse racing is unlawful within the intent of these statutes. The assumption is erroneous and

cannot be upheld. Neither the keeping or exhibiting of a gaming table, establishment, device or apparatus, nor the playing at a game is prohibited. On the contrary, such things, as far as these sections of the statute are concerned, may be done with impunity. It is only when such tables, etc., are kept or exhibited to win or gain money or property, or when the play at a game is for a sum of money or other property, or a bet is made upon the result of such game that the acts become unlawful and the doers thereof subject to punishment. Moreover, there can be a game without the element of either chance or hazard. A game is any sport or amusement, public or private. It includes physical contests whether of man or beast, when practiced for the purpose of deciding wagers or for the purpose of diversion, as well as games of hazard or skill by means of instruments or devices.—*Boughner v. Meyer,* 5 Colo. 71, 74; *Corson v. Neatheny,* 9 Colo. 212.

As defined in the Century dictionary, it is "a contest for success or superiority in a trial of chance, skill or endurance, or of any two or all three of these combined: as, a game at cards, dice, or roulette; the games of billiards, draughts, and dominoes; athletic games; the floral games. The games of classical antiquity were chiefly public trials of athletic skill and endurance, as in throwing the discus, wrestling, boxing, leaping, running, horse and chariot-racing, etc."—*Desgain v. Wessner,* 161 Ind. 205; *People v. Weithoff,* 51 Mich. 203.

A horse race, according to the weight of authority, though there are decisions to the contrary, is a game within the meaning of the statutes against gaming.—20 Cyc., p. 884; *Thrower v. State,* 117 Ga. 753; *Swigart v. People,* 154 Ill. 284.

Whether it is such within the meaning of the sections under consideration, we must now determine. In *Corson v. Neatheny, supra,* we held that a horse race was a game within the intent of section 1796, R. S., 1908, citing: *Boughner v. Meyer, supra; Talman v. Strader,* 23 Ill. 493; *Shropshire v. Glascock et al.,* 4 Mo., 536; *Boynton v. Curle,* Id. 599.

*Boughner v. Meyer, supra,* involved the validity of a check, the consideration of which was a wager as to whether a certain execution issued upon a judgment would or would not be collected. Section 1796, *supra,* was quoted and the question propounded; "Was the consideration of the check won by any gaming within the meaning of the section above quoted?" We then said: "If the wager was upon any game, the check is absolutely void in the hands of every holder. Horse-racing had been decided to be gaming within the intent of the language here used. * * * But a wager as to whether an execution can be collected, we are constrained to conclude, cannot be considered as a wager upon any game." It was unnecessary to, and we did not determine therein, whether horse racing is a game within the meaning of that word as used in the section. We, nevertheless, declared that it had been so decided, citing *Tatman v. Strader, supra; Shropshire v. Glasscock, supra; Boynton v. Curle, supra.* But in *Corson v. Neatheny, supra,* we referred to the *Boughner-Meyer* case, and the authorities therein cited, and expressly held that horse racing is gaming within the intent of the section. That the case might have been decided exactly as it was, as claimed by plaintiff in error, does not render the holding *obiter.* The decision was based upon the applicability of the statute, and, therefore, determined that horse racing is a game, and betting thereon is gaming, within the meaning of the section.

As the section of the statute involved and construed in the *Corson-Neatheny* case affects only contracts, etc., entered into as a result of gaming, or in which the consideration was for money, property or other valuable thing won by gaming, declaring them void and of no effect, and the decisions cited therein are in civil cases, it is claimed that the rule announced and applied therein is not applicable in the construction of the criminal sections. A sufficient answer thereto is, that the alleged civil section involved and construed in that case, and the criminal sections upon which this prosecution is based, are

·embodied in, and form a part of, the same legislative act.— Session Laws 1866, p. 56; R. S. 1868, pp. 224, 225; G. L. 1877, pp. 297-299; G. S. 1883, pp. 332-334.; R. S. 1908, secs. 1791, 1792, 1796. .

We must ascribe the same meaning to the same words ·occurring in different parts of the same statute, unless it clearly appears therefrom that a different meaning was intended.— *Dixon v. People,* 53 Colo. 527; 127 Pac. 930.

. This does not appear from the statute in question.   On the contrary, it is clearly evident that the same words in the several sections of the act were used in the same sense, and the purpose of the law-making power was to suppress gambling, which, as used in the act, includes betting and winning money ·or property upon any game whatsoever.   The title of the act of 1866 is, "An act to suppress gambling and gambling houses," and that law has been in no substantial respect ·changed or modified by subsequent legislation.   We can not ·assume that the law-making power used the words "game" ·and "gaming" in a different sense in one section of the statute· from that in which it employed them in other sections of the ·same act.   In the passage of each of these sections the legislature must have had in mind the immorality of the acts and the ·evils resulting.   Under section 1791 the party ·violating the provisions thereof is to be punished by fine and imprisonment; ·under section 1792 the offender is subjected to a pecuniary penalty, while under section 1796 certain contracts, etc., the ·consideration of which has arisen from the practice of the immoral and inhibited acts, are rendered nugatory and of no effect.   So, in order to effectually suppress gambling, the act subjects the violator thereof to punishment and makes it impossible, 'upon the instruments designated, for any person to reap the fruits growing out of the acts prohibited.

But *Corson v. Neatheny, supra,* as an authority is questioned.   It is claimed that this court in basing that opinion upon *Tatman-Strader, supra,* did not take into consideration the difference between the Illinois statute and the Colorado

statute upon the subject, and that the former statute, after the word "game" uses the words "or sport" and contains other words not found in the latter statute upon which that decision could properly be based. The words "game" and "sport" are synonymous.—Webster's dictionary. Moreover, the statute under consideration in the *Tatman-Strader* case was section 1 of chapter XLVI of the Illinois Revised Statutes of 1845. We observe no substantial difference in respect to the question now under consideration between that section and section 1796, *supra,* of our own statute. If anything, the language of the latter is broader and more comprehensive than that of the former. It was not until long after the decision in *Tatman v. Strader, supra,* that the words said to be excluded from our statute, and included in the Illinois statute, appeared in either the criminal or civil sections of the statutes of that state.— Secs. 129, 130, p. 174, and sec. 1, p. 263, R. S. Ill. 1845; sec. 1, Public Laws of Illinois, 1871-72, p. 462; par. 179, sec. 131, p. 792, Vol. 1, Starr & Curtiss' Annotated Statutes, Illinois, 1885.

Counsel for plaintiff in error maintain that the history of the several legislative acts on the subject of gambling in this state shows conclusively that horse racing is not a game within the meaning thereof, and that the holding in *Corson v. Neatheny, supra,* in that regard is illogical and incorrect. We can not concur in this view. On the contrary, when we bear in mind the provisions of the several acts, their titles, nature, the history of their enactment, and the state of the law when passed, the conclusion is inevitable that the legislative intent, as the law now is, was to prevent public gambling, and includes the risking of money or anything of value between two or more persons, on a contest of either chance, skill or hazard, where one must be the loser and the other the gainer.

Our first legislation on the subject is found in the Session Laws of 1861, p. 313, under the heading: "Offenses Against the Public Morality, Health and Police," embodied in "An act concerning criminal jurisprudence." It consisted of but two

sections. The first section on the subject, being section 112 of the act, made it a crime for any person to "deal or play at or make any bet or wager for money or other thing of value, at any of the games commonly known or called three card monte, the strap game, thimble, the patent safe game, or any other game of similar character, or shall induce, or attempt to induce, any person whatever to make any bet or wager at any such game," etc. The other section, being sec. 113 of the act, prohibited the keeper of a house, etc., to knowingly permit a person within such house, etc., "to deal or play at any of the games mentioned in the preceding section, or any game of similar character, or any game or games of cards, roulette, dice, or any other games where fraud or cheating is practiced, or where loaded dice or marked cards or waxed cards are used," etc. These sections are aimed exclusively at games and bets and wagers thereon in which an element of cheating, trickery or fraud enters, and in no sense at fair and honestly conducted games or betting thereon.

The second act upon the subject was in 1864 Session Laws, p. 96, entitled: "An act to suppress gambling and gambling houses." Section 1 thereof makes it a criminal offense for any person to keep a house, etc., "or place resorted to for the purpose of gambling, or permit or suffer any person" therein "to play at monte, three card monte, or any other game at cards, dice, faro, roulette, or any other game whatever for money or other things of value." The second section subjected any person to fine and imprisonment who should, in such gambling house or place, "play at any game for any sum of money or other property of value" or make therein a bet or wager for money or other property of value. Section 3 made all contracts, when any part of the consideration thereof was for money or other valuable things won or lost, laid or staked upon any game or bet or wager, absolutely void and of no effect.

In argument it is pointed out that in this act we find for the first time the words "any other game" associated with

"monte, three card monte," etc., and it is impossible to conceive that horse racing or betting or wagering thereon was included within the meaning of the statute; and further, that the act does not penalize gambling generally, but only gambling and betting at a place resorted to for the purpose of gambling and the keeping of such place. Such is unquestionably the purpose of the act, and it may be that under the rule of *ejusdem generis* the gambling and games prohibited thereby are such only as belong to the class enumerated therein. Be that as it may, subsequent legislation broadened the law materially. In 1866 Session Laws, p. 56, "An act to suppress gambling and gambling houses" was adopted. The act consists of sections 1 to 12, inclusive, and as to the offenses created and the acts and things prohibited, seems to be identical with sections 1790 to 1796, inclusive, of the Revised Statutes of 1908. This act differs materially from those preceding it. The things prescribed therein are as follows: section 1, places used or occupied for gambling, the keeping of gaming tables, apparatus or establishment therein to be used for gambling and winning, betting or gaining money or other property; section 2, which is section 1791, R. S. 1908; the keeping or exhibiting "any gaming table, establishment, device, or apparatus to win or gain money or other property," and the practice of gambling; and section 3, which is section 1792, R. S. 1908; the playing "at any game whatsoever," for a sum of money or other property of value, and betting and wagering upon the result thereof. These changes in the law are significant and pregnant with meaning. Previous legislation was directed against games and bets thereon in which an element of cheating, trickery or fraud entered, and to places wherein such games and bets continuously occurred; whereas this act, being the law as it now is, is directed against all places used or occupied for gambling, the keeping or exhibiting of gaming tables, establishments, devices, etc., to win or gain money or other property, the practice of gambling and the playing "at any game whatsoever" for a sum of money or other thing of

value, and betting and wagering upon the result thereof. There being no enumeration of specific games, subjects or things, the general words used must be ascribed their ordinary meaning. The language is plain and unambiguous. The statute does not prohibit the playing of games. It is only when they are made instruments of winning or losing money or property that a criminal character attaches to them. When we bear in mind the purpose of the act as expressed in its title, the enumerated things prescribed, it is clear that the law intends to, and does, prohibit every place commonly used or occupied for gambling of any character whatsoever, and the keeping and exhibiting of any instrumentality to be used for gambling and winning, betting or gaining money or other property upon the result of any game, and likewise the practice of gambling.

The words "gaming table, establishment, device or apparatus," as used in the statute, do not mean literally instrumentalities with appliances adapted and essential to particular games, but include any species of table, establishment, device or apparatus kept and used for gambling, winning, betting or gaining money or other property. It is the use to which the article or thing is appropriated which renders the keeping or exhibition thereof unlawful within the meaning of the sections here involved.—*Toney v. State,* 61 Ala. 1; *Estes v. State,* 10 Tex. 300, 308; *Chappell v. State,* 27 Tex. App. 310, 312; *Jones v. Okla. Ty.,* 5 Okla. 536.

"Gaming table" is said to be synonymous with "gaming house." 20 Cyc., p. 967. It means a place kept for gambling and supplied with materials for that purpose. It may include any kind of contrivance used in betting. Cyc., *supra, Garvin v. State,* 87 Tenn. (13 Lea) 162. This is made more certain by the word "establishment" used in connection therewith. One meaning of this word is, the place of business, including grounds, furniture, equipage, etc., with which one is fitted out; also that which serves for the carrying on of a business. So a device is that which is devised, or formed by design; a con-

trivance; an invention; a project; a scheme; often, a scheme to deceive; a stratagem; an artifice. And "apparatus" means, things provided as means to some end. A full collection or set of implements, or utensils, for a given duty, experimental or operative; any complex instrument or appliance, mechanical or chemical, for a specific action or operation; machinery; mechanism.

A gaming table, therefore, consists in the essentials of the game. A table in the literal sense need not exist. A game played and something of value bet are the essential elements of a gaming table, establishment, device or apparatus as used in this act. In *Garvin v. State, supra*, Desty's Amer. Crim. Law, section 102b, is quoted as follows: "Setting up a gaming table consists in providing the essentials of the game, and a table in the literal sense need not exist, nor money or property be staked, but credit may be substituted, yet a game must be played and something bet." It is then said, page 173; "If this law is sound, and the proof shows it is, a gaming table is any place convenient for and in which the game may be played. If 'setting up a gaming table consists in providing the essentials,' and a real table is not necessary, then the room, the hall, the house or *other place* used for gaming purposes, is one of the indispensable 'essentials' of a gaming table. * * * A house, etc., could not be kept for the conduct of the prohibited games unless the tools of the game were also kept. A house, hall, or room kept for a purpose must be supplied with the materials for that purpose. As already intimated, all these combined constitute a gaming table, or gaming house, the terms are synonymous in gaming vernacular."

Applying these rules to the facts of this case, we think it is clear that plaintiff in error kept and exhibited a gaming table, establishment, device and apparatus to win or gain money or other property, and played at a game and made a bet on the result thereof for a sum of money. He had a place, to-wit: the space adjoining the grand stand, kept for gambling, and supplied with materials for that purpose, that is, the table,

the blackboard, the slips and the horse races then run, which
latter he adopted and made a part of his establishment, project
or scheme.   These constituted a gambling table, establishment,
device or apparatus.   They were the essentials of the game as
devised or projected as a means to a certain end.   That plain-
tiff in error had nothing to do with the running of the races
is of no consequence.   The acts and instrumentalities of others,
in that respect, he adopted and thereby they became, in legal
effect, his.   It might well be said that his establishment, device
and apparatus, that is, his gaming table, included the race
tracks and the horses thereon to the same extent and effect as
though they were confined to the limits of the platform upon
which he stood and operated.   He brought them there by adop-
tion and made them and their acts his for the purposes of his
plan of operation.   He, and those participating in the pools,
were, in the understanding of all, "playing the races."

As said in *Joseph v. Miller*, 1 New Mex. 621, 626:  "We
are unable to discover any distinction in general principle be-
tween the various methods that may be adopted for determin-
ing by chance who is the winner and who the loser of a bet—
whether it be by throwing dice, flipping a copper, turning a
card, or running a race.   In either case it is gambling.   This is
the popular understanding of the term 'gambling device' and
does not exclude any scheme, plan, or contrivance for deter-
mining by chance which of the parties has won, and which has
lost a valuable stake.   That a horse-race, when adopted for
such purpose, is a 'gambling device,' there can be no doubt."
To the same effect and quoting the above language in *James v.
State*, 4 Okla. Crim. Rep. 587.   A horse race is a game, and
selling pools or making books upon the result of a horse race
is gaming, because it is betting on a game, and is unlawful,
though the game itself be not unlawful.   *Swigart v. People,
supra*, affirming the same case in 50 Ill. App. 181.—*Edwards
v. State*, 8 Lea 441; *Thrower v. State, supra; People v. Weith-
off, supra; Miller v. U. S.*, 6 D. C. 6.

In 1867 Session Laws, p. 114, the territorial legislature created a private corporation under the title, "The Ford's Park Association" which, it is claimed, constitutes a legislative construction of the anti-gambling statutes that will not permit the meaning we have ascribed to them. The objects of the association were the encouragement of stock raising and the improvement of the breed of horses within the territory. It was authorized to acquire and own a certain described tract of land; to hold thereon a horse fair once in each year; to offer such premiums and purses for horses to be exhibited and competed for, and to charge an admission to any race not to exceed $1.00 for each person. The association was required to enter and record in a book all wagers made upon any trial of speed held upon the grounds, and the act made such wagers so entered a valid and legal contract enforcible in any court of competent jurisdiction. Two and one-half per centum of the winnings of all wagers so recorded, and of the purses and premiums competed for, were required to be paid to the treasurer of the territory of Colorado by the association for the use and benefit of the Colorado Territorial Agricultural Society.

We do not think the act is in any sense a legislative construction of the gambling statutes. On the contrary, its legal effect simply suspended the operation of the gambling statutes as to certain of the inhibited acts herein, but only upon one day in each year, in a designated and limited space. In other words, it was like unto a license authorizing the doing of certain acts, at a particular time and place, which, without the license and at any other time or place, would be unlawful. Because the law-making power authorized pool-selling and book-making upon horse races occurring, at the time, upon the limited territory described in the act of incorporation, and under the control of the incorporated association, does not establish or manifest a legislative intent to authorize such acts upon like events occurring elsewhere, at other times, nor does it in any sense indicate that such acts are not within the meaning of, and made unlawful by, the statutes aforesaid, but rather that

they are thereby inhibited. Otherwise, why grant the power to the association and place limits upon its exercise?

But it is said that prior to this prosecution, neither lawyer nor layman considered acts like those of plaintiff in error as being within the inhibition of the statutes. However that may be, it does not subtract from the legal meaning of the words used in the legislation which corresponds precisely with the historical and popular meaning. It is a matter of common knowledge that many laws are enacted which lie dormant, in whole or part, for years. We know of no court, however, that has held that things clearly within the letter and spirit of an act are excluded from the operation thereof because of such desuetude. The judgment of conviction is affirmed.

*Judgment affirmed.*

Chief Justice Musser , and Mr. Justice Garrigues concur.