## The People v. Frank Weithoff.

*Keeping a pool-room—Gaming—Act 171 of 1877.*

Keeping a pool-room for selling pools on horse-races and base-ball games is within the statute punishing the keeping or maintaining of a gaming-room or gaming-table or of any game of skill or chance. Comp. L. § 1998, amended by Act 171 of 1877.

Gaming exists wherever a stake is laid on the chances of a game; and base-ball and horse-racing are games and so is any pooling scheme in betting thereon.

Exceptions before judgment from the Recorder's Court of Detroit. (Swift, J.) June 19.—July 2.

KEEPING a gaming room. Respondent was convicted. Exceptions overruled.

*John Atkinson* and *Maybury, Conely & Lucking* for respondent appellant.

Attorney General *Jacob J. Van Riper*, Prosecuting Attorney *James Caplis* and *Fred A. Baker* for the People.

COOLEY, J.   The defendant has been convicted in the Recorder's Court of the city of Detroit on an information which charges him and one Henry Price with an offence which in general language is sufficiently described as the unlawful keeping and maintaining of a gaming-room contrary to the provisions of the statute.

The information contains seven counts.   The first count charges that Price, Weithoff and one Davis on May 15, 1883, at the city of Detroit, unlawfully, for hire, gain and reward, did keep and maintain a gaming-room against the form of the statute, etc.

The second count, with proper allegation of time and place, charges that they did unlawfully, for hire, gain and reward, keep and maintain a gaming-room, and in the said gaming-room, for hire, gain and reward, unlawfully did suffer and permit divers idle and evil-disposed persons to come together for the purpose of gaming, and to be and remain there engaged in gaming for divers large and excessive sums of money.

The third count charges that unlawfully, for hire, gain and reward, they did keep and maintain a gaming-room, and in the said gaming-room, for hire, gain and reward, unlawfully did suffer and permit divers idle and evil-disposed persons to come together for the purpose of gaming by betting divers large and excessive sums of money on the result of divers games of base-ball and divers horse-races, and in the said gaming-room unlawfully did permit and suffer the said idle and evil-disposed persons to be and remain engaged in gaming by betting divers large sums of money on the result of divers games of base-ball and divers horse-races.

The fourth count charges that they unlawfully, for hire, gain and reward, did keep and maintain a gaming-room known as " Harry Price & Co.'s Turf Exchange," and in

the said gaming-room did carry on and conduct a business commonly known as "pool-selling," and in the said gaming-room did sell pools on horse-races, commonly known as "auction pools," and also pools on games of base-ball played by the clubs belonging to the "National League," so called, which last-named pools are commonly known as "combination pools," and did also, in said gaming-room, sell pools on horse-races, commonly known as "combination pools," and also certain other pools on horse-races, commonly known as "Paris mutuals,"—all of said pools being a combination of bets or wagers upon the result of horse-races, or of games of base-ball.

The fifth count charges that, for hire, gain and reward, they did keep and maintain a gaming-room, and in the said gaming-room did carry on the business of pool-selling and did sell pools on horse-races, commonly known as "auction pools," and which said pools were sold and conducted in manner following: A horse-race being about to take place in some part of the United States, the person conducting the business of pool-selling would give the names of the horses which were to participate in the race, and an auctioneer would ask what was offered for first choice, and the first choice would be sold to the highest bidder and the person being the highest bidder would select his horse. Second choice would be sold in the same way; also third choice if there were any bidder for it; and all other horses in the race would be sold together as the field for one bid. The different purchasers would pay their money to the person carrying on the business, and would receive checks in return, on which would be marked the amount of the bid and the purchase made by him, and the total amount in the pool. Upon the result of the race being announced, all the money in the pool would be delivered to the person who had named or purchased the successful horse, less a commission of five per cent., which would be retained by the person or persons selling the pools. And on, etc., the persons named did sell a large number of auction pools upon horse-races which

took place during that time in different parts of the United States.

The sixth count charges that they did unlawfully, for hire, gain and reward, keep and maintain a gaming-room, and in said gaming-room did sell pools upon games of base-ball being played by the clubs belonging to the National League, so called; said pools being commonly known as "combination pools," and which said business of pool-selling was conducted in the manner following: There are eight base-ball clubs in the League, so called, who usually play on the same day in different parts of the country. In the said gaming-room was a blackboard headed "Combination of four clubs," with sixteen lines ruled off underneath. On each of said lines are written the names of said clubs in the different combinations, on which, immediately to the left of the names so written, are placed numbers, ranging from nine to twenty-four, both inclusive. Only four clubs can win. A person wishing to bet on a combination selects it by its number, for which he pays fifty cents, and receives in return a ticket or check bearing the name of the proprietor, and a number corresponding to the combination selected by him. As many persons as choose can bet on any particular combination, and purchase any number of tickets, all the money thus put in constituting a pool. The persons who bet on the four winning clubs, constituting one combination, are entitled to the pool less five per cent. commission; the remainder to be divided among the persons who purchased the winning combination, according to the number of their checks. And the persons named sold a large number of said combination pools.

The seventh count charges the unlawful keeping of a gaming-house for betting money and laying wagers in the form and manner commonly known as pool-selling, and need not be further described.

On the trial it was admitted on the part of the defendant that he was, at the time specified in the information, with the other persons named keeping a room in the city of Detroit for the sale of pools upon horse-races and games of

base-ball, as described in the information; but it was denied that the room so kept and used was a gaming-room within the meaning of the statute for the punishment of that offense. The Recorder however charged the jury that the selling of pools was a game, and the keeping of a room for that purpose was the keeping of a gaming-room, and the defendant was convicted. The case comes before us on exceptions before sentence.

The statute under which the information is filed is section 15 of chapter 43 of the Revised Statutes of 1846, as amended in 1877. It reads as follows:⁻

"Any person who shall for hire, gain, or reward keep or maintain a gaming-room, or a gaming-table, or any game of skill or chance, or partly of skill and partly of chance, used for gaming, or who shall knowingly suffer a gaming-room, or gaming-table, or any such game to be kept, maintained or played on any premises occupied or controlled by him, shall be deemed guilty of a misdemeanor, and upon conviction thereof, be punished by fine not exceeding five hundred dollars, or imprisonment not exceeding six months, or both, in the discretion of the court; and any person aiding, assisting, or abetting in the keeping or maintaining of any such gaming-room, gaming-table, or game shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by fine not exceeding five hundred dollars, or imprisonment not exceeding three months, or both, in the discretion of the court." Public Acts 1877, p. 168.

As the defendant does not contest the facts, but admits that he with others was actually engaged in the keeping of a room where pools were sold according to the various methods described, and was doing this for gain and reward, the sole question which the record presents is whether the use of the room for this purpose makes it a gaming-room within the meaning of the statute. If it does, the defendant is properly convicted; but if not, he is entitled to a discharge.

The defence contend that a room in which pools are sold is not for that reason a gaming-room. Gaming, it is said, implies games: to game is to play at any sport or diversion;

to play for a stake or prize; to use cards, dice, billiards or any other instruments according to certain rules with a view to win money or any other thing waged upon the issue of the contest; to practice playing for money or any other stake; to gamble. Playing at games may have an entirely innocent sense, or it may import what is looked upon as immoral. The language of the statute is broad enough to include all gaming-rooms kept for hire; but this could never have been intended, for many games are lawful. A reasonable conclusion is that only the gaming-room is intended in which unlawful games are carried on. Games become unlawful by being prohibited by statute; and it becomes necessary therefore to a conviction, that it should appear—*first*, that the room was kept or maintained for the purpose of games; and *second*, that the games for which it was kept or maintained have been made unlawful.

But pool-selling, it is further said, is no game. To buy the tickets may be in the nature of a bet or wager, but betting alone cannot be held to constitute gaming unless all distinctions are confounded. It is necessary not only that there be betting upon the determination of the event, but the course of action to bring about such event must have originated and commenced with a view to determine the bet. *Lynall v. Longbothom* 2 Wils. 36; *State v. Smith* Meigs 99. There is nothing of the sort in pool-selling; the persons concerned in bringing about the event—the men who play ball and who race horses—are strangers to it, and they do not play or race with a view to the stakes which may be ventured upon the result.

These are the positions taken on the part of the defence, and which the prosecution contest. The issue turns upon the meaning of the word " gaming-room" as used in the statute. Upon this issue the previous legislation of the State ought to cast some light, and some notice of it will, therefore, not be out of place.

The earliest statute we have on the subject is the territorial statute of October 12, 1818, (1 Terr. L. 412,) purporting to be adopted from the laws of Massachusetts and

New York, but having a more remote origin in statute 9 Anne. The title to this statute is "An act to prevent gaming." The preamble recited as the occasion for passing it that "the practice of gaming for money and other property is not only injurious in a high degree to the individuals concerned therein, but also in its tendency ruinous and destructive to the community." Looking into the act, however, we find that it is not restricted in its scope to the laying of wagers upon games, but that the winning or losing at any one time by play or by betting more than four dollars, or within twenty-four hours more than eight dollars, is made a criminal offence, and all securities and conveyances the consideration of which, in whole or in part, is money or other valuable thing won at betting or gaming, are made void. Other provisions are equally general.

The main provisions of this statute were re-enacted under the same title and preamble in the Code of 1827, p. 492, and were retained in the Compilation of 1833, p. 477, and continued in force until the adoption of the Revised Statutes of 1838. In that Revision we find similar provisions in a chapter entitled "Of the observance of the first day of the week and the prevention and punishment of immorality": but the subheading to the sections relating to this subject is entitled simply "Gaming," though "betting of every description" is carefully specified and made punishable. It is noticeable also, that though section ten of the chapter authorizes any one who shall have lost money by playing at games or by betting, to sue and recover the same back, the next section employs the word "gaming" to express the method of all such losses. Rev. St. 1838, pp. 210–213.

Substantially the same provisions appear again in the Revision of 1846, and the subheading "Gaming" is again employed for sections which contain the provisions against wagers, and in which money lost "by any betting whatever" is spoken of as lost by gaming. Rev. St. 1846, pp. 192, 193; Comp. L. 1857, pp. 501, 503. Some of these are still in force. Comp. L. 1871, pp. 651–653.

It cannot be said, in the light of this review, that in the

legislation of this State any sharp distinction has at any time been drawn between betting and gaming. On the contrary they seem to have been considered and treated at all times as varieties of the same mischief, whose characteristics were so nearly identical that it was not always important to distinguish them in providing for their punishment. Nevertheless both have commonly been mentioned, and the context has in most cases implied a distinction. Moreover in providing for the punishment of gaming there has commonly been such specification of games as would, under accepted rules of construction, restrict the criminal penalties to the games mentioned and to others which were similar.

In the common usage of the two terms "betting" and "gaming," they may sometimes be employed interchangeably but not always. If two persons play at cards for money, they are said to be gambling or gaming ; but they are gaming because they lay a wager or make a bet on the result of the game, and therefore to say they are betting is equally appropriate. If two persons lay a wager upon the result of a pending election, it will be said that they are betting, but not that they are gaming. There is no gaming in which the element of the wager is wanting, but there is betting which the term "gaming" is not commonly made to embrace. But the mischievous element against which the statute is aimed is present in all betting when money or other valuable thing is staked, and no violence is done to language when all such betting is classed as gaming, as manifestly it sometimes has been in our legislation, and to some extent always. It would probably never occur to any one that the article of the State Constitution which precludes embracing in a single law more than one object, which should be expressed in the title, would be violated by a law which, with a title like that of the Act of 1818, should not only undertake to punish gaming but also betting of every description. Neither do we think it would be deemed an inaccurate or inappropriate use of language if all betting for money were to be spoken of and considered as gaming or gambling. It is so common for persons accustomed to speak with accuracy

and propriety to apply one or the other of these terms to any species of immoral betting, that we learn the application intended and the precise meaning in any particular case only. from the connection. Often we find the terms " gaming " and " gambling " applied to transactions which are illegal in the sense only of being immoral, but which involve the element of wager, as in the case of option contracts. *Gregory v. Wendell* 39 Mich. 337; s. c. 40 Mich. 432; *Raymond v. Leavitt* 46 Mich. 447; *Shaw v. Clark* 49 Mich. 387. But while such contracts are probably not gaming in the sense of any criminal law now on the statute books, there could be nothing to prevent their being legislated against under that head, when they are of the nature of gaming and embody its evils.

But conceding, for the purposes of further discussion, that in order to constitute gaming there must not only be betting upon uncertain events, but that the uncertain events must be such as are to be determined by games, we may next direct attention to the argument for the defense that there is no gaming unless the course of action which is to bring about the event shall have been commenced and prosecuted with a view to determine the wager. The illustration given is a bet upon an election, in which case that which is to determine the wager, namely, the election, is not instituted for the purposes of the wager, but would take place irrespective of it. In the particular instance given, if a single wager only were laid, it would certainly not be called gaming in common speech; but that there is any such restricted meaning of the term "gaming" which can be applied generally and as a rule, we cannot agree. If two men play cards for money, they may be supposed to have begun and carried on the game with a view to the wager, and they will be said to be gaming. If two others sitting beside them also make a bet upon the result of the same game, their act has the same elements of immorality and mischief, and differs only in the unimportant circumstance that they do not participate in the manipulation of the cards. The first two play and bet; the last two bet on the hands of those

who are playing; but in common language as well as in the law, all would be said to be gambling or gaming. If on the other hand the players have only amusement in view, and have no connection or concern with what is done by the others, the game is not then originated or prosecuted with a view to determine the wager which is laid upon it; but notwithstanding this the parties betting would be said to be gambling in this case as much as in the others. The game itself is innocent in either case: it is the betting upon the game that constitutes gaming, and those game or gamble who thus bet.

That the pooling schemes contemplated putting money at stake upon the issue of games is not denied. They had in view base-ball games, which are games in the strictest sense, and also horse-races. These last have often been held games, within the meaning of the statute of Anne, when made for wagers. *Goodburn v. Marley* Strange 1159; *Blaxton v. Pye* 2 Wils. 309; *Grace v. M'Elroy* 1 Allen 563; *Tatman v. Strader* 23 Ill. 493; *Mosher v. Griffin* 51 Ill. 184; *Ellis v. Beale* 18 Me. 337; *Cheesum v. State* 8 Blackf. 332; *Wilkinson v. Tousley* 16 Minn. 299; *McLain v. Huffman* 30 Ark. 428. So have been dog-fights, *Eagerton v. Furzeman* 1 C. & P. 613; and foot-races, *Lynall v. Longbothom* 2 Wils. 36; and cock-fighting, *King v. Howel* 3 Keb. 465; *Squires v. Whisken* 3 Camp. 140; *Bagley v. State* 1 Humph. 486; *Johnson v. State* 4 Sneed 614; *Commonwealth v. Tilton* 8 Met. 232). All the pooling arrangements, therefore, had games in view. And while, in our opinion, it is of no importance that the races or games are not begun or carried on with a view to the stakes which are laid upon them, or that those who race or play are not the persons who hold tickets in the pools, it is proper to remark that it is pure assumption in this case to say that such is the fact, for the record does not establish it. The existence of pooling-rooms, and the fact that profit may be made by their use for the purpose intended, must have a natural tendency towards the getting up of games that pools may be formed. But if the games are planned without regard

to the pooling, the room which is kept for the purpose invites the parties concerned in the games to participate with others in the hazards of the pools; and if they refrain from doing so, it is not because the room does not offer them its accommodations, but because they fail to accept them. But the offense which the statute punishes consists in keeping the room and offering its temptations to the public; not in the acceptance of the offer by any particular persons or class of persons.

It being found, then, that the pooling schemes contemplate gaming, it remains to see whether the room which is kept for the purposes of the schemes, is to be held a gaming-room. In gaming, as the term is used in distinction to mere betting, some special evils are always expected and generally found to exist. There is more or less withdrawal of attention from business and from social and family duties, while the game or contest which is to determine the wager is going on; there is a consequent tendency to idleness and unthrift; there is likely to be more publicity than in mere betting, and a gathering of persons whose excitement and anxiety react upon each other and incite to further stakes and to other vicious indulgences and disorderly conduct. These evils are greatly multiplied when a house or room is specially set apart and devoted to the purposes of gaming; and it is upon a recognition of this fact that the State sometimes punishes the keeping of such rooms, when it would leave unnoticed the mere laying of wagers; as it might punish the public sale of intoxicants but not private drunkenness. The characteristics of such a room must be readily apprehended and understood. If the room is one whose use is intended to facilitate gaming operations, and where sporting characters are invited to congregate for purposes of illegal amusement and gain, and to stake money or other thing of value upon trials of chance, skill or endurance, we seem to have everything necessary to constitute a gaming-room. That some or all the games or trials are innocent is of no importance. *Clayton v. Jennings* 2 W. Bl. 706. If forbidden wagers are laid upon them, it is gaming;

and the room, if the use of it is calculated and intended to facilitate the wagers, and the proprietor derives his profits from them, is a gaming-room.

We do not overlook the fact that the games upon which the wagers are laid do not take place in the room but at a distance. It is not necessary that persons be present at the place of game or contest in order that they may participate in the mischiefs of gaming. Betting upon a game of billiards which is being played in New York can as readily be carried on in a distant city, in a room appropriated to the purpose, as in the very room where the playing is going on; and if the latter is a gaming-room, so must the other be. Nothing seems more unimportant than that the game —the part that in itself is innocent, and which only furnishes the occasion and gives opportunity for the criminality—is at a distance.

To hold this room a gaming-room it is not necessary to proceed upon any strained construction of the statute; it is only necessary to give it effect according to its obvious intent. The statute is aimed at the particular evils of keeping, for hire, gain or reward, a room to aid and facilitate gaming. This is the precise purpose, and so far as we are informed, the sole purpose, for which the defendant keeps the room in question.

So far we have assumed that it was necessary for the State to establish the proposition that the defendant's room is a gaming-room even though the recorder was mistaken in holding the pooling itself to be a game. But we are not satisfied that he erred in this. The word "game" is very comprehensive, and embraces every contrivance or institution which has for its object to furnish sport, recreation or amusement. Let a stake be laid upon the chances of the game, and we have gaming. Eminent judges have thought the pooling scheme was to be considered a game, *Tollett v. Thomas* L. R. 6 Q. B. 514; *Scollans v. Flynn* 120 Mass. 271, 273; and it was so decided in *Edwards v. State* 8 Lea 411. 'It does not furnish sport, recreation or amusement except so far as the excitement of the choice of

chances may furnish it; but this is true of many contrivances which are always called games and which the law aims to suppress.    There is no good reason for a distinction between pooling and such games.

The exceptions are not sustained and the Recorder will be advised to proceed to judgment.

The other Justices concurred.