[Criminal No. 402.    Filed December 22, 1916.]

[161 Pac. 893.]

### S. W. McCALL, Appellant, v. STATE, Respondent.

GAMING—EVIDENCE.—In a prosecution under Penal Code of 1913, section 321, for conducting a gambling device known as "pari mutuel," conviction set aside.

[As to what constitutes buying or selling pools within statute against gaming, see note in Ann. Cas. 1916B, 100.]

APPEAL from a judgment of the Superior Court of the County of Maricopa. R. C. Stanford, Judge. Reversed and remanded, with instructions.

Mr. G. P. Bullard and Mr. Lewis T. Carpenter, for Appellant.

Mr. Wiley E. Jones, Attorney General, Mr. Leslie C. Hardy and Mr. Geo. W. Harben, Assistant Attorneys General, and Mr. C. M. Gandy, County Attorney, for the State.

CUNNINGHAM, J.—Appellant contends that the information fails to state facts sufficient to charge a public offense, and the court erred in overruling appellant's demurrer based on that ground.

Omitting the formal allegations, the charging portion of the information is as follows:

"The said S. W. McCall, . . . on or about the 9th day of November, 1915, and before the filing of this information, at and in the county of Maricopa, state of Arizona, did then and there willfully and unlawfully carry on, open, conduct and cause to be opened a certain banking and percentage game commonly known as French pool or pari mutuel, which said game was then and there played with a certain device, to wit, a betting machine commonly known and called by the name of French pool or pari mutuel machine, which game was then and there played for money, checks, credits and other representatives of value. . . . Contrary to the form," etc.

The information is drawn under section 321 of the Penal Code of Arizona of 1913, which is as follows:

"Every person who shall deal, carry on, or open, or cause to be opened, or who shall conduct, either as owner, proprietor, or employee, whether for hire or not any banking or percentage game whatsoever played with cards, dice or any other device, whether the same be played for money, checks, credits, or any other representatives of value, . . . shall be guilty," etc.

The information substantially charges the offense of conducting a banking or percentage game played with a device commonly called a "French pool," or "pari mutuel," machine.

The information, though inartificially drawn, is probably sufficient, if sustained by the evidence. The machine is described by the name by which it is commonly known. The manner of playing the game by the use of the machine mentioned is not apparent from the information. The court, as a legal proposition, may not take notice of the game referred to and of the method of using such machine in playing the game, in the absence of allegations setting forth such facts, and therefore the court cannot say, as a matter of law, that a banking or percentage game condemned by the statute could not be played with a pari mutuel machine such as the accused is charged by the information with opening. After conviction I will consider the information sufficient to charge a public offense under the statute and put the accused upon his defense. I do not wish, however, to be understood as approving the form of the information for a precedent for general use.

The appellant complains that the court erred in denying his motion to dismiss the charge upon the grounds that the evidence was insufficient to warrant a conviction.

The cause was tried by the court without a jury, upon an agreed statement of facts; consequently, the evidence is without conflict, and if substantial evidence in support of the material allegations of the information appears in the record, the judgment of conviction must be sustained on this appeal. With the weight of the evidence this court has nothing to do. That question is for the lower court.

The facts shown by the record are: That on the ninth day of November, 1915, before a horse-race commenced on the race-track at the fair grounds in Maricopa county, Arizona, the accused produced a device commonly called a "pari mutuel" machine. The accused furnished tickets to bettors who desired to lay bets on the proposed horse-race about to start. The bettor, taking a ticket, named the horse selected by him to win the race, and delivered $2 to the accused at the time of receiving the ticket. The tickets furnished the bettor, by the accused, bore the name of the horse selected by the bettor to win the race. The accused caused such ticket, furnished by him, to be registered on the machine and closed the machine when the race started, and held all the money given to him in exchange for all the tickets until the result of the race was declared. The machine registering the tickets furnished the bettors recorded the total number of tickets furnished, and the number of tickets furnished naming each horse in the race to win. When the result of the race was known, the accused deducted ten per cent from the total sum of money, so in his hands, as his commission, and divided the balance of such sum among the holders of the tickets bearing the name of the horse declared the winner of the race. The accused "did not wager any money upon the result of the race and . . . the division of the money is not determined by the pari mutuel machines, or by the owners or operators thereof, but by the result of the horse-race, but that the machine merely indicates the number of tickets sold upon the different horses in the race and the operators, and owners of the machine merely divide the money paid in for tickets less their commission."

The trial court held in effect that such facts constitute the carrying on of a banking or percentage game played with a device other than with cards or dice for money, checks or other representatives of value, by the accused, and he was therefore guilty of a violation of section 321 of the Penal Code of Arizona of 1913, and adjudged that he be punished therefor, accordingly.

The question is whether the accused by the use made of the machine, as described in the statement of facts, violated the criminal law and thereby incurred the penalty prescribed by section 321 of the Penal Code. In other words, is the accused guilty of conducting a gambling game played with any device other than with cards or dice, by the operation of his pari mutuel machine, in registering tickets sold by him to the bettors on a horse-race?

Certainly holding the stake is not playing a game. Dividing the stake and paying it out to the several winners is not playing a game. Holding a commission for the services rendered in the transaction is not playing a game. Neither can the furnishing of the tickets be considered as playing the game. Under the evidence the game played was the horse-race. The bets were laid on the result of that contest. If a horse-race may be considered a game and a gambling device, as some courts have affirmed and others denied, yet the accused is not charged with playing a game with horses running on a prepared track as gambling devices. The specific charge is that he conducted a gambling game by the use of a pari mutuel machine as a device. Clearly, then, the horse-race, the tickets sold, the pooled funds in the accused's hands, his commissions, and the division of such funds and his paying them out to the persons entitled, are not involved in this charge, because he is not charged with conducting a horse-race game in the first place; and, in the second place, those things which he did in the premises do not amount to conducting any game whatever.

If the charge has been maintained by the evidence, then, such evidence showing that the accused registered the tickets sold by him to the bettors, and kept a record of such tickets by means of the machine, is the only evidence supporting the charge that the accused conducted a gambling game by means of a device other than with cards or dice, to wit, a pari mutuel

machine. To hold that such evidence is sufficient to support the charge of a public offense condemned by our statute would to my mind be wholly absurd. The accused is not charged with betting on the horse-race. The record is clear that he wagered nothing upon the result of the race. Had he been charged with gambling on the horse-race, the evidence clears. him of that charge, unless he by his acts became an accessory. In which event we may have been called upon to determine whether the law condemns as a crime betting. on horse-races; but such question is not here presented, and until such question is properly before this court we may not declare an opinion thereon. I am of the opinion that the evidence fails. to support the allegations of the information.

For these reasons I am of opinion that the judgment of conviction should be vacated, the cause remanded, with instructions to dismiss the cause and discharge the defendant.

ROSS, C. J.—I concur in the disposition of this case as directed by Justice CUNNINGHAM, but feel that I should give my reasons therefor, inasmuch as I do not approve of all that is said by my learned Associate.

I do not think the count of the information upon which the appellant was convicted states a public offense, and, if that be true, our opinion should be limited to a decision of that question. The statute, (section 321, Penal Code 1913) prohibits. banking and percentage games of every kind played with cards or played with dice or played with any other device. The statute particularizes the instrumentalities, to wit, cards and dice, with which some of the games forbidden may be played. Experience teaches that those who have a penchant or passion for gambling are very ingenious in inventing new devices and contrivances with which to gratify their appetite for gambling, and at the same time evade the letter, if not the spirit, of the law, and the lawmakers, familiar with this well-known fact, after mentioning banking and percentage games played with cards and dice, anticipating, likewise prohibited banking and percentage games "played with . . . any other device." .The games prohibited, then, are those played with named devices, to wit, cards and dice, and those played with unnamed devices.

The information names the game played by appellant as French pool, or pari mutuel, and the device with which the game is said to be played is "a betting machine commonly known and called by the name of French pool or pari mutuel." Neither the game nor the instrumentalities with which it is played is further described in the information. Within and of itself, and the human factor which is always present in gambling, the game is alleged to be played. If a banking or percentage game can really be played with a pari mutuel machine, then the information is sufficient. 20 Cyc. 880 and 881, defines a "game" as follows:

"A 'game' has been defined as any sport or amusement, public or private. It includes physical contests, whether of man or beast, when practiced for the purpose of deciding wagers, or for the purpose of diversion, as well as games of hazard or skill by means of instruments or devices."

The game prohibited by the statute is not only a game, but it is a gambling game; it must "be played for money, checks, credits or other representative of value." "Gaming" or "gambling" is defined to be:

"The risking of money or other property between two or more persons on a contest of chance of any kind where one must be the loser and the other the gainer."

Where the game is played with cards, the cards themselves determine who is the winner and who the loser. This is likewise true with dice. An information charging that the gambling was with cards or dice or with any other well-known instrumentality, which in and of itself determines the contest, would doubtless state a public offense under the statute. As was said in the case of *People* v. *Engeman*, 129 App. Div. 462, 114 N. Y. Supp. 174; Id., 195 N. Y. 591, 89 N. E. 1107:

"This is the test: Whether the implement or device is used in determining who shall win or lose; whether it is an integral part of the actual gambling. A 'gambling device' is defined (20 Cyc. 871) as an 'invention often used to determine the question as to who wins and who loses, that risk their money on a contest or chance of any kind; anything which is used as a means of playing for money or other thing of value, so that the result depends more largely on chance than skill.'"

If the pari mutuel machine, with which it is alleged the appellant played a gambling game, decides or determines who

shall win or who shall lose, it is one of the "devices" prohibited by the statute.

"Paris mutuels" is defined by the Standard Dictionary as follows:

"A pool in betting, as in a horse-race, in which each bettor lays a fixed sum on the contestant that he selects, and those who choose the winners divide the entire stake, less the percentage of the person who furnishes the pool tickets; literally, mutual bets."

This definition is descriptive of the game known as "pari mutuel," and not of pari mutuel machine used by the bettors in registering their bets. The game as defined might well be played without any machine whatever. "The person who furnishes the pool ticket," as easily conceived, might do so without the aid of any automatic machine or apparatus whatever; he could use his hat or any other receptacle in which to deposit the bets and give a written receipt to each bettor for the amount of his bet and the horse of his backing. From his hat or a bucket or a basket the stake could be distributed among the winners, less a percentage. Neither the receptacle in which the bets are deposited nor the tickets issued to a bettor, nor both combined, would in the least determine who was the winner or who the loser; nor can it be said that the person who presides over the receptacle, and who issues the pool tickets or receipts, either bets or determines the bets that are made. The pari mutuel machine and the proprietor thereof and the functions that they each perform are stated in the stipulation of the parties as follows:

"Said pari mutuel machine is an indicator of the number of tickets sold on each horse in a horse-race; not only an itemizer but a totalizer of said tickets. That the tickets are two dollars ($2) apiece. At the time of the purchase of a ticket, the man who sells it calls out the name of the horse the ticket was purchased on to the man who operates the indicator or machine; said man registering the ticket sold. That the pari mutuel machine registers like an automatic turnstile the number of tickets sold upon each horse, and also registers the total number of tickets sold upon the race. At the moment the race starts the machine is closed and no more tickets are sold upon the race. After the race is run and the result declared, all money taken in by the seller of tickets is evenly

divided among those people who purchased tickets on the winning horse less ten per cent (10%) which is deducted by the operators of the machine as their commission. That the owners and operators of the machine did not wager any money upon the result of the race and that the division of the money is not determined by the pari mutuel machine or by the owners or operators thereof, but by the result of the horse-race and that the machine merely indicates the number of tickets sold upon the different horses in the race and the operators and owners of the machine merely divide the money paid in for tickets less their commission."

A pari mutuel machine, it would seem, differs from the crude and primeval method of registering bets instanced above principally, in this: It is automatic; it is quicker, and free from mistakes. Because of this facility in operation, it is doubtless more attractive and alluring to persons desiring to place bets on contests, such as horse-racing and events of that kind. It has a tendency to emphasize, stabilize and encourage the evil of gambling; its business is to invite, encourage and facilitate wagering upon horse-racing.

Notwithstanding all this, the proprietor and owner of the machine and the machine, while forming the nucleus of a betting crowd, do not play the game of horse-racing; it is the crowd that plays the game; the proprietor and the machine hold the pool and distribute it after the race to the winners, retaining a percentage for their services. The machine, in and of itself, does not determine who wins or loses. It might be used in connection with any physical contest, whether of man or beast, as, for instance, in registering bets on foot-races or boxing or jumping matches, on baseball contests, or on horse-racing or trotting races. In all these cases, however, the winner is determined, not by the pari mutuel machine, but by the contestants—the men or horses. It will be seen, therefore, that the pari mutuel machine, while used in connection with gambling, is not a device which determines who shall win or lose and is not a device with which a game is played; it is an instrumentality employed by those gambling, but it is not a device mentioned in the statute with which a game is played.

The stipulation clearly shows that the game in this instance was a horse-race, and the courts have disagreed as to whether

horse-racing is a game or not. We think those that hold that it is are not only in the majority, but are supported by the better reasoning. *James* v. *State*, 4 Okl. Cr. 587, 140 Am. St. Rep. 693, 34 L. R. A. (N. S.) 515, 112 Pac. 944; *James* v. *State* (Okl. Cr.), 113 Pac. 226, 33 L. R. A. (N. S.) 827. And taking that view of the case, we find that there were people gambling on horses and that the appellant was not one of them. He was merely registering the bets and acting as stakeholder for the bettors, using the machine to facilitate his labors. True, he kept a percentage of every bet made, and if the pari mutuel machine was the arbiter of the contest, or in and of itself determined who was the winner or loser, he would be within the statute, and the information would be sufficient.

A pari mutuel machine is as innocuous in and of itself as a faro-table without cards, a roulette-table without the ivory balls, a stein without beer, a goblet without wine. These are alike harmless without the complement of cards, balls, beer and wine. So likewise, is the pari mutuel machine without the horse-race or other contest of chance.

It is plainly absurd to say a game of chance can be played with a pari mutuel machine in and of itself, and yet that is what the information charges. It is as reasonable to say faro may be played with a faro-table alone; roulette, with a roulette-table alone; beer drunk from an empty stein; or wine from an empty goblet.

There must be a contest of chance of some kind before the pari mutuel machine is usable, and it must be operated in connection with the contest of chance. The count of the information upon which appellant was convicted is silent as to any contest of chance.

The power to say what acts or omissions shall constitute a crime and be punished is entirely with the legislative department. It may limit or extend the law in that regard as it chooses. It is the only department of the state vested with the right and power to define crimes and fix punishments. It may make all gambling, of whatever kind or nature, a crime. In the exercise of the police power for the public morals, it is all powerful. It might have made it a crime to bet on horseracing or baseball contests or foot-racing, but it has not seen fit to do so. It might have made it a crime to keep and oper-

ate a pari mutuel machine or any machine or apparatus used in connection with gambling, but it has not done so.

It is useless to say that courts cannot make laws or supply deficiencies or omissions in laws made by the legislature. When their jurisdiction is invoked in a proper case, it is their duty to interpret and construe the law as they find it. The question for this court to decide in this case is whether the facts set forth in the count of the information upon which the appellant was convicted constitute a public offense. It is not whether what the appellant actually did constitutes a crime under the law or not, but whether the facts set forth in the information make out a crime. It is so clear to my mind that the facts charged do not constitute a public offense, that I would have to do violence to my conscience in order to sustain the information.

An information or indictment must contain "a statement of the acts constituting the offense in ordinary and concise language. . . . " Section 934, Penal Code 1913. An inspection of the count of the information upon which appellant was convicted discloses that it does not set forth sufficient acts to constitute an offense. The acts alleged, in and of themselves, do not show that appellant was playing a game with a device that determined who was the loser or the winner.

FRANKLIN, J. (Dissenting).—I cannot agree with the court in the disposition made of this case. This proceeding is technically what is known as an "agreed case." While it is criminal in its form, it is brought for the purpose of obtaining the opinion of the court as to whether or not what is commonly known as race-track gambling is permissible through the operation of the pari mutuel system of betting. It is obvious from an examination of the record presented that the end sought is not an adjudication by the court of the guilt or innocence of the defendant, but a judicial expression which will determine whether resorts may be maintained in this state for public gambling at race-tracks provided the plan adopted is a pooling scheme with a pari mutuel machine and operator, race-track, horse-races and other paraphernalia as essentials of the project. In the brief of the Attorney General supplementing that of the defendant in favor of reversing the judgment of conviction, the matter is thus frankly stated:

"The cause is submitted to the court upon the briefs of appellant and respondent, for the purpose of having this court definitely pass upon the question, so that those interested in the pari mutuel machine, so far as they may be conducive to encouraging horse-racing within the state of Arizona, may be advised of their rights to operate such machines with impunity."

An information in four counts was filed, a jury was waived, and the cause was submitted to the superior court on an agreed statement of the facts. The court found the defendant guilty and based the conviction on the first count of the information, which happens to be very awkwardly drawn and subject to exceptions according to the rules of pleading applicable to criminal informations.

A proceeding of this kind ought not to be encouraged by the courts. I know of no law which authorizes it. If such a practice is to be sanctioned, it needs no comment to emphasize the evils which may ensue from the practice in invoking the exercise of judicial power, not to decide an existing controversy, but to establish a rule for controlling future conduct. Parties who wish for advice in such matters should consult lawyers.

The function of courts upon elementary principles of sound public policy must be confined to the determination of a present actuality.

The notion is thus stated in *California* v. *San Pablo & Tulare R. Co.,* 149 U. S. 308, 314, 37 L. Ed. 747, 13 Sup. Ct. Rep. 876, 878:

"The duty of this court, as of every judicial tribunal, is limited to determining rights of persons or of property, which are actually controverted in the particular case before it. When, in determining such rights, it becomes necessary to give an opinion upon a question of law, that opinion may have weight as a precedent for future decisions. But the court is not empowered to decide moot questions or abstract propositions, or to declare, for the government of future cases, principles or rules of law which cannot affect the result as to the thing in issue in the case before it. No stipulation of parties or counsel, whether in the case before the court or in any other case, can enlarge the power, or affect the duty, of the court in this regard."

Even in a civil cause which, by virtue of a statute (paragraph 510, Rev. Stats. [Civ. Code] 1913), may be submitted under certain circumstances on an agreed statement of the facts, courts will not consider an agreed case which is not a real case, but one simply intended to secure the opinion of the judges as a guide for future conduct. Such a remedy is not intended to enable parties to use the court as advisory in their business and pursuits, and any attempt to obtain the opinion of the court upon a question of law through the instrumentality of a supposititious case is regarded as reprehensible, and the party offending may be punished for contempt. See Submission of Controversy, 37 Cyc. 346.

If these "agreed cases" are to be tolerated, however, I think it behooves the court not to over-emphasize on the technique of legal pleading, with no emphasis at all upon policies and principles. In these kinds of cases the pleadings are as the dead bark of the tree and the facts of the case as the roots and the living, growing inner core. The information, as I have said, is in four counts. Some of these counts, in my opinion, under the liberal rules of pleading allowed by the Code, are good. The demurrer interposed was a general demurrer and apparently a formal one. If any of the counts are good, the demurrer was properly overruled. No argument is made in this court, either orally or in the briefs, against the sufficiency of the information. The office of an information is to apprise the defendant as to the offense with which he is charged. Here the defendant stipulated the facts of the case. An agreed case, where it is permitted, takes the place of pleading. As in this court, so in the lower court perhaps, no contention as to the pleading was urged or desired. If the lower court felt it to be a duty to entertain the proceeding at all, I think it was right in not looking narrowly at the information, but broadly at the facts to ascertain if these facts were criminal in their nature, and I think this is eminently a proper case for this court to heed the admonition of section 1170 of the Penal Code of 1913, as follows:

"After hearing the appeal, the court shall give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties, and no judgment in any criminal case shall be reversed for techni-

cal error in pleading or proceedings when upon the whole case it appears that substantial justice has been done.''

In 1909 an act was passed ''to prohibit gambling in the territory of Arizona.'' Chapter 92, Laws 1909. Its provisions have been translated into the Penal Code of 1913 as follows:

''319. Every person who shall deal, carry on, or open, or cause to be opened, or who shall conduct, either as owner, proprietor or employee, whether for hire or not, any game of faro, monte, roulette, lasquenet, rouge-et-noir, rondo, vingt-un or twenty-one, poker, stud poker, draw poker, bluff, fan-tan, thaw, seven and one-half, chuck-a-luck, black jack, or any similar game whatsoever, played with cards, dice or any other device, and every slot machine or machine of like character whether the same be played for money, checks, credits or any other representative of value within the state of Arizona, shall be guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not less than one hundred dollars nor more than three hundred dollars or by imprisonment for not more than six months, or by both such fine and imprisonment.

''320. If any proprietor, owner or part owner, lessee, manager or any person having management, supervision or control, temporary or permanent of any gambling-house or other resort, maintained for gambling or of any saloon or of any building in which a saloon may be situate shall permit any of the games mentioned in the preceding section to be played in such place, he shall be guilty of a misdemeanor, and upon conviction thereof shall be punished as provided in the preceding section.

''321. Every person who shall deal, carry on, or open, or cause to be opened, or who shall conduct, either as owner, proprietor, or employee, whether for hire or not any banking or percentage game whatsoever played with cards, dice or any other device, whether the same be played for money, checks, credits, or any other representatives of value, within the state of Arizona, shall be guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not less than one hundred dollars, nor more than three hundred dollars, or by imprisonment for not more than six months or by both such fine and imprisonment.

''322. If any proprietor, owner, or part owner, lessees, manager or any person having management, supervision, or

control, temporary or permanent, of any gambling-house or other resort maintained for gambling or of any saloon or of any building in which a saloon may be situate, shall permit any of the games mentioned in the preceding section to be played in such place, he shall be guilty of a misdemeanor."

The facts upon which the superior court based its judgment of conviction were stipulated to be as follows:

"It is hereby stipulated between the prosecution represented by C. M. Gandy, and the defendant represented by G. P. Bullard, that the following facts are true and may be considered in evidence in the above-entitled matter; both the prosecution and defense waiving the method of taking said testimony and stipulate that the following agreed facts should constitute the record evidence in the above-entitled proceeding, to wit:

"That at the state fair grounds in the county of Maricopa, state of Arizona, there was conducted, but not by this defendant, a horse-race between two horses, viz., Antilla and H. B.; Antilla being owned by a man by the name of Stanley and H. B. by a man by the name of Schultz. That said horse-race was held on said fair grounds on the mile track of said fair grounds on the said ninth day of November, 1915. That prior to said race and upon the same day at said fair grounds in said Maricopa county, the defendant conducted and operated a pari mutuel machine. That said pari mutuel machine is described as follows: Said pari mutuel machine is an indicator of the number of tickets sold on each horse in a horse-race; not only an itemizer but a totalizer of said tickets. That the tickets are two dollars ($2.00) apiece. At the time of the purchase of a ticket, the man who sells it calls out the name of the horse the ticket was purchased on to the man who operates the indicator or machine; said man registering the ticket sold. That the pari mutuel machine registers like an automatic turnstile the number of tickets sold upon each horse, and also registers the total number of tickets sold upon the race. At the moment the race starts the machine is closed and no more tickets are sold upon the race. After the race is run and the result declared, all money taken in by the seller of tickets is evenly divided among those people who purchased tickets on the winning horse less ten per cent (10%), which is deducted by the operators of the machine as their commission. That the owners and operators of the machine did

not wager any money upon the result of the race, and that the division of the money is not determined by the pari mutuel machine or by the owners or operators thereof, but by the result of the horse-race, and that the machine merely indicates the number of tickets sold upon the different horses in the race, and the operators and owners of the machine merely divide the money paid in for tickets less their commission.

"It is further stipulated between the prosecution and the defense that upon said ninth day of November, 1915, at said race-track in Maricopa county, state of Arizona, that the defendant operated a pari mutuel machine in the manner in this stipulation described, and did sell tickets upon said race in the manner in this stipulation described, and did subsequent to the race and after the result of the race had been declared divide money, among those persons holding tickets upon the winning horse, the total of all the money paid in for tickets on said race less the commission for the operation of the machine."

As in this case, the view was urged in *Schmidt* v. *Territory*, 13 Ariz. 77, 108 Pac. 246, that the act "was more comprehensive in its restriction than was desired, in that it prohibited almost all kinds of games 'in nearly every place where such games are usually played,' and that taking into consideration the history of the times when the act was passed, and the evil sought to be remedied, the statute as a whole must be construed as directed solely against the carrying on of such games by professional gamblers; but," said the court, "the rules of construction invoked are only applicable where the statute itself is ambiguous, and we see no ambiguity in those provisions under consideration."

What is the scope and meaning of this act? Its title as originally enacted was "An act to prohibit gambling in the territory of Arizona."

The rule of the common law that penal statutes are to be strictly construed, has no application to this Code. All its provisions are to be construed according to the fair import of their terms, with a view to effect its object and to promote justice. Section 5, Penal Code.

Under this statute the courts of the state are required to construe the penal statutes of this state liberally according to the fair import of their terms, and when it can be reasonably

done, to give each statute such a construction as will enable it to reach and destroy the evil at which it is aimed.

To determine that a case is within the intention of a statute, its language must, of course, authorize us to say so; but "the courts follow the reason and spirit of such statutes till they overtake and destroy the mischief which the legislature intended to suppress. In doing so they often go quite beyond the letter of the statute." Lewis' Sutherland on Statutory Construction, 2d ed., Vol. 2, p. 1077.

It will be observed that paragraph 319 prohibits the carrying on, opening or conducting certain enumerated games, "or any similar game whatsoever, played with cards, dice or any other device." Statutes of a like kind are found in most of the states. It is clear that the project of the defendant would not come within the inhibition of this statute, because the games specifically enumerated are those which have been repeatedly adjudged to be games which require some kind of an apparatus or contrivance upon the manipulation or operation of which alone the result of the game is determined. Under such a statute, the general character of such devices is fixed, and the words "or any other device" must be construed *ejusdem generis* with the particular devices that are described, and in connection with the games enumerated in the preceding portion of the section.

This is the kind of a statute that was before the court of Oklahoma in *James* v. *State*, 113 Pac. 226, 33 L. R. A. (N. S.) 827, where the defendant was charged with conducting a turf exchange or pooling scheme for betting on horse-races, and a conviction was affirmed; but subsequently the court receded from that ruling and reversed the conviction under that statute, applying the familiar rule of *ejusdem generis,* requiring that the device alleged in the information must be a device similar to those particularly described in the statute. See *James* v. *State,* 4 Okl. Cr. 587, 140 Am. St. Rep. 693, 34 L. R. A. (N. S.) 515, 112 Pac. 944. The opinion of Judge Furman in 113 Pac. 226 is exhaustive, and while I agree that the application of the statute before the court in that case was too broad, the reasoning, if applied to statutes like sections 321 and 322 of the Penal Code of Arizona of 1913, is an unanswerable piece of logic.

These statutes have a much broader and more comprehensive intention than is to be found in sections 319 and 320, because, if by interpretation the meaning is to be restricted to the kinds of games and devices of a similar character named in those statutes, the Penal Code has been uselessly encumbered with meaningless verbiage.

The language of the statute was skillfully framed in not denouncing as an offense the use of the pari mutuel machine by name, in not descending into too minute particulars, but leaving the language broad enough to comprehend the mischief sought to be destroyed. One of any considerable experience at all must know that rules of conduct to be effective must necessarily be expressed in general terms, and depend for their application upon circumstances; and circumstances vary. The comprehensive, absolute and unqualified expressions used by the legislature show that they regarded this species of gambling as a serious evil, and they desired to suppress it, and for reasons which they considered satisfactory they saw fit not to permit it under any circumstances. In the contest between the police and the betting confraternity, much ingenuity has been shown by the votaries of sport in devising means for evading the terms of such like enactments, and, owing to the diversity in the statutes, there is a consequent crop of legal decisions showing considerable divergence of judicial opinion.

This is largely due to the law-making power in attempting to regulate human conduct by particularizing too much and failing to generalize by expressing their meaning in terms so that the mischief sought to be avoided could receive the application of the statute as the varying circumstances of the particular case arise.

This seems to have been recognized in an early English statute against gambling, wherein the preamble to the act recited: "Divers and many subtle, inventive and crafty persons have found and daily find many and sundry games and plays."

If the legislature sought to prohibit the conduct and operation of banking and percentage games by any device whatsoever, it is well that it used general terms; for, if it had attempted to do so by a particular name, the legislation would

have lagged far behind the ingenuity of those who would see profit in devising new methods or schemes for its evasion.

It is not enough to say that there is no law against horse-racing. That is a sport recognized and encouraged by the legislation of this state. This would be as idle as to say the law frowned upon the great American sport of baseball. But it is ridiculous to say that a horse-race is permitted for the purpose of gambling upon the result of it, or that thereby it is the public policy of the state to encourage the citizen to stake his substance upon a wager that the mare "Antilla" could beat the horse "H. B." in a race of half a mile. It is not enough to say that there is no law against laying a wager on the result of a horse-race, or that defendant did not do any betting. Those are not matters involved here at all. The question is: Did the defendant conduct or operate a banking or percentage game played with a device for money, checks or credits, or any other representative of value? "Game," "gaming" and "gambling" are terms of allied meaning, as I speak of them. They are difficult exactly to define or adequately to distinguish, but are associated with the staking of money or money's worth on the result of a game.

The word "device" is not technically defined in the law, and must therefore be given its common acceptation. The Century Dictionary says:

"A scheme or plan; something devised or studied out for promoting an end; specifically something contrived for an evil or selfish purpose; a wrongful project, stratagem or trick."

"*French Pool.* A contrivance used in betting, by which betting money or other thing is or may be won or lost; a contrivance used to make wagers on horse-races." 20 Cyc. 849.

The invention is known in France as the "Paris mutuels"; in Australia, as the "totalizator." This kind of a pooling scheme doubtless has different names as the exigencies of the situation may require.

Mr. Brown says (Common Words and Phrases, 324):

"This modern 'pool' differs from that of Siloam in two particulars; it is always 'disturbed,' and nobody who descends into it ever comes out cured."

To get an intelligent idea we must not isolate the parts, and analyze the machine, the race-track, horse-races, betting, etc., separately. To do so would be a narrow and indefensible

construction of the statute, whereas the Code requires a reasonable and forbids a strict construction of penal statutes. But we must look at the facts collectively as they appear in the stipulation, at the plan or scheme as a whole. Though it is proper to value small parts, as, "Sands make the mountain, moments make the year," yet we must contemplate collectively, to have a just estimation of the plan which defendant is charged with operating. As in filling a vessel drop by drop, though each may not be enough, there is at last a drop which makes it run over. Let us not divide the objects of our attention into minute parts, and think separately of each part. But let us contemplate the large mass of facts found in the stipulation, and in doing this I am persuaded they are criminal in their nature as tested by section 321 of the Penal Code, as well as of several other statutes which will hereafter be mentioned.

In this connection I quote with approval the language of Judge Furman as applicable to sections 321 and 322 of the Arizona Penal Code:

"We think that, by the use of the words 'or any device,' . . . the legislature meant to include every scheme or plan or conception by which the person who opened or conducted a house, room, or place for betting, induced and enabled persons to bet or lay wagers upon any kind of game whatsoever; and that the charge contained in the information constituted a violation of this section of our law; and that the purpose of this statute was not aimed exclusively at any particular game or species of games, but was intended more effectually to suppress every kind of public gaming in the state of Oklahoma, not only those then in existence, but also those that might subsequently be devised and practiced. The great evil and vice aimed at was not the horse-races, but the seductive allurements held out to the people, young and old, to frequent gaming-tables and indulge in excessive gaming and thereby become the victims of the professional gambler." *James v. State,* 113 Pac. 226, 229, 33 L. R. A. (N. S.) 827.

I think that the Attorney General has easily been misled in taking the position that the operation of the pari mutuel system of betting in conjunction with horse-races is not forbidden by the gaming statutes of this state. I am more persuaded of this because the case he cites as authority for the

position (*James* v. *State*, 4 Okl. Cr. 587, 140 Am. St. Rep. 693, 34 L. R. A. (N. S.) 515, 112 Pac. 944), emphatically declared that the conduct of turf exchanges for betting upon horse-races constituted common gambling-houses and are nuisances *per se.* That "under section 5771 of Snyder's Compiled Laws of Oklahoma of 1909, their operation may be enjoined; they may be abated as provided in chapter 71 of said laws; and under section 2465 of said laws their operation constitutes a misdemeanor, and those who conduct them may be prosecuted criminally and have inflicted upon them the punishment prescribed by section 2032." See, also, *State* v. *Lawrence,* 9 Okl. Cr. 16, 130 Pac. 508. These Oklahoma cases are learned expositions of the law on the subject of gaming statutes, and well worth perusing. The statutes cited from Oklahoma have found expression in the laws of Arizona. See following sections of the Penal Code of Arizona of 1913: Sections 322, 335, 317, 383, 385, And the case last cited from Oklahoma will show the relevancy of these Code citations from Arizona.

The attorneys for the defendant, however, have, in my opinion, a much clearer conception of the law pertaining to this matter. In the brief for the defendant, prepared by very able criminal lawyers, it is said:

"In Oklahoma and Illinois and other states it is settled that horse-racing is gaming, and doubtless in those states where the statutes have by legislative enactment or by judicial construction been made to mean that horse-racing is gaming, then the pari mutuel or any other kind of an arrangement for recording wagers on horse-races would be construed as a gaming device, but by no possible stretch of judicial construction can it be said that section 321 of the Revised Statutes of Arizona [Pen. Code] were intended by the legislature to apply to a race-course or a grand-stand or a place where horse-races were conducted, but rather it is clear that the said section was intended to prevent gambling-houses and such games as are usually conducted in gambling-houses."

This puts the matter just as it must be put, and if horse-racing when practiced or adopted for the purpose of deciding bets is gaming, the matter is clear. It is obvious that no such exception as contended for by defendant is found in the law, and, of course, the courts must not engraft upon the law an

exception not contained in it. It must be apparent to any mind that there can possibly be no reason for the exception urged in favor of this kind of public gambling, because it is engaged in on a grand-stand at the state fair grounds, or similar places. Acts of this character are just what the statute seeks to prohibit.

The operation of the pari mutuel system of public betting on horse-races in such a multitude of people, and in the presence of and among the men and women, boys and girls there assembled, instead of lessening the evil of public gambling sought to be prohibited, would only aggravate it to an alarming extent. The contention involves an absurdity, and the argument, like Waller's Eagle, is pierced by a feather quivered from its own wing.

This has been interestingly discussed in the case of *State* v. *Lawrence,* 9 Okl. Cr. 16, 130 Pac. 508.

That any kind of a contest when practiced or adopted for the purpose of deciding bets or wagers becomes gaming, and that a horse-race under such circumstances is gaming, there can be no doubt. 12 R. C. L., § 17; 20 Cyc., pp. 880, 881, and the great number of authorities cited in the note 50 to subd. 5, at page 884. See, also, *State* v. *Falk,* 66 Conn. 250, 33 Atl. 913; *Debardelaben* v. *State,* 99 Tenn. 649, 42 S. W. 684; *Watson* v. *State,* 3 Ind. 123; *Redman* v. *State,* 33 Ala. 428; *State* v. *Stripling,* 113 Ala. 120, 36 L. R. A. 81, 21 South. 409; *Cheesum* v. *State,* 8 Blackf. (Ind.) 332, 44 Am. Dec. 771, and note; *People* v. *Weithoff,* 51 Mich. 203, 47 Am. Rep. 557, 16 N. W. 442; *Shropshire* v. *Glascock,* 4 Mo. 536, 31 Am. Dec. 189; *St. Louis Fair Assn.* v. *Carmody,* 151 Mo. 566, 74 Am. St. Rep. 571, 52 S. W. 365; *In re Opinion of the Justices,* 73 N. H. 625, 6 Ann. Cas. 689, 63 Atl. 505.

"Horse-racing was not the evil which the legislature designed, by these enactments, to forbid. . . . But it was the mischievous practice of gambling upon horse-races which the lawmaker here intended to reach." *State* v. *Lovell,* 39 N. J. L. 463.

The injurious effects of the practice are in no way affected by the plan or project adopted. In this case it was held that a place for the sale of pools upon horse-races is a disorderly house. To the same effect, see *State* v. *Nease,* 46 Or. 433, 80 Pac. 897.

That a horse-race or a pari mutuel machine may be adopted as essentials of a gambling device I think, also, is beyond question.

I have not read the case of *Tollett* v. *Thomas*, L. R. 6 Q. B. 514, but I gather from the expression of learned judges that it was held in that case that the use of the machine called the "pari mutuel" is a mechanical contrivance, and as such is an instrument of gaming. While the court of king's bench did not decide that a horse-race of itself was a game of chance, it did decide that the use of the machine changed it from a lawful to an unlawful game, and introduced an element of chance in it.

In *Com.* v. *Simonds*, 79 Ky. 618, it was said:

"It is true, the operator or owner of the machine, by receiving five per cent certain, without regard to the issue of the race, is not guilty of gaming or betting, in a technical sense, because he hazards nothing; but the ticket buyers are engaged in unlawful betting, whereby they either win the money of other ticket buyers or lose their own, and the machine is used by the ticket buyers in betting, and the operator or owner of the machine sets it up, exhibits, and uses it for the ticket buyers, and to aid them in unlawful betting, whereby they win money or lose money, and we are therefore of the opinion that the evidence shows in this case that the accused set up, exhibited, and used the machine known as 'French pool'; that it is a contrivance used in betting, by which betting money or other thing is or may be won or lost, and it is within the description of the statute."

It is said in the case of *Miller* v. *United States*, 6 App. D. C. 6, 13, holding that a horse-race may be one of the essentials of a gambling device:

"The reason and policy of the law, as well as its comprehensive language, apply as well to all games and devices then existing, as to all that might be subsequently devised and practiced. That being the object to be accomplished, what could be more grossly obnoxious to the provisions of the statute, or more demoralizing to the community, than the existence of places for the making and selling of books and pools upon horse-races, baseball games, foot-races, dog-fights, cock-fights, and all other conceivable contests upon which money may be bet or wagered. The great evil and vice of the thing

is not in the horse-race, the foot-race, or the baseball game, but in the seductive allurements held out to people, young and old, to frequent the gaming table, or the gambling device, and to indulge in excessive betting, and thereby become the victims of the wily and scheming professional gambler. Whether the game or contest upon which the wager is made be a horse-race, foot-race, baseball game, or what else, it is quite immaterial, if the thing or contest upon which the bet or wager is made be a game of chance. It has from an early time been held that a horse-race is a game of chance, and so is a game of baseball, and so a foot-race, where wagers have been made upon them. *Goodburn* v. *Marley,* Str. 1159; *Blaxton* v. *Pye,* 2 Wils. 309; *Grace* v. *McElroy,* 1 Allen (Mass.), 563; *Lynall* v. *Longbottom,* 2 Wils. 36; *People* v. *Weithoff,* 51 Mich. 203, 47 Am. Rep. 557, 16 N. W. 442. And a horse-race being a game, within the meaning of the St. Anne, c. 14, against gaming, though not specially mentioned, but being embraced in the general words 'other game or games' (2 Wils. 309), there can be no reason for excluding horse-races from the games contemplated or fairly embraced by the terms of the act of 1883.''

Cooley, J., in the case of *People* v. *Weithoff,* 51 Mich. 203, 47 Am. St. Rep. 557, 16 N. W. 442, 447, speaking for the court said:

''The word 'game' is very comprehensive, and embraces every contrivance or institution which has for its object to furnish sport, recreation or amusement. Let a stake be laid upon the chances of the game, and we have gaming. Eminent judges have thought the pooling scheme was to be considered a game. *Tollett* v. *Thomas,* L. R. 6 Q. B. 514; *Scollans* v. *Flynn,* 120 Mass. 271, 273. And it was so decided in *Edwards* v. *State,* 8 Lea (Tenn.), 411. It does not furnish sport, recreation or amusement except so far as the excitement of the choice of chances may furnish it; but this is true of many contrivances which are always called games and which the law aims to suppress. There is no good reason for a distinction between pooling and such games.''

In construing the gaming statutes of Colorado, the supreme court of that state said:

''He had a place, to wit, the space adjoining the grandstand, kept for gambling, and supplied with materials for

that purpose; that is, the table, the blackboard, the slips, and the horse-races then run, which latter he adopted and made a part of his establishment, project, or scheme. These constituted a gambling-table, establishment, device or apparatus. They were the essentials of the game as devised or projected as a means to a certain end. That plaintiff in error had nothing to do with the running of the races is of no consequence. The acts and instrumentalities of others in that respect he adopted, and thereby they became, in legal effect, his. It might well be said that his establishment, device and apparatus—that is, his gaming-table—included the race-tracks and the horses thereon to the same extent and effect as though they were confined to the limits of the platform upon which he stood and operated. He brought them there by adoption and made them and their acts his for the purposes of his plan of operation. He and those participating in the pools were, in the understanding of all, 'playing the races.' As said in *Joseph* v. *Miller,* 1 N. M. 621, 626: 'We are unable to discover any distinction in general principle between the various methods that may be adopted for determining by chance who is the winner and who the loser of a bet—whether it be by throwing dice, flipping a copper, turning a card, or running a race. In either case it is gambling. This is the popular understanding of the term "gambling device," and does not exclude any scheme, plan or contrivance for determining by chance which of the parties has won, and which has lost a valuable stake. That a horse-race, when adopted for such purpose, is a "gambling device," there can be no doubt.' To the same effect and quoting the above language is *James* v. *State,* 4 Okl. Cr. R. 587, 140 Am. St. Rep. 693, 34 L. R. A. (N. S.) 515, 112 Pac. 944. A horse-race is a game and selling pools or making books upon the result of a horse-race is gaming, because it is betting on a game, and is unlawful, though the game itself be not unlawful. *Swigart* v. *People* [154 Ill. 284, 40 N. E. 432], *supra,* affirming the same case in 50 Ill. App. 181; *Edwards* v. *State,* 8 Lea (Tenn.), 411; *Thrower* v. *State* [117 Ga. 753, 45 S. E. 126], *supra; People* v. *Weithoff, supra; Miller* v. *United States,* 6 App. D. C. 6"; *Everhart* v. *People,* 54 Colo. 281, 282, 130 Pac. 1080, 1081.

"At common law keeping a gaming-house was an offense before any sort of game was prohibited, and was punished when gaming was not even against public policy, when the courts recognized such contracts, and by solemn judgment made the loser pay his bet. But to maintain a place for the purpose of inducing men to gather and game was a common nuisance, because of its tendency to corrupt morals and ruin fortunes. *United States* v. *Dixon*, 4 Cranch C. C. 107, Fed. Cas. No. 14,970. The game might be harmless, or, if in private, only the immediate actors would be affected; but when the public were invited, when there were always present those ready and anxious to stake, when the gains of one incited others to participate, when the pride of public success stimulated the winner, and the loser attempted to hide the mortification of defeat by a bold front until the last coin was gone, the law was bound to interfere. The English rule and our own statute are both based on the recognition of the cumulative evil which may inhere in a multiplicity of acts not themselves criminal." *Thrower* v. *State*, 117 Ga. 753, 45 S. E. 126.

In *State* v. *Mathis*, 206 Mo. 604, 121 Am. St. Rep. 687, 105 S. W. 604, the defendant was convicted of keeping gambling devices, to wit, two poker-tables and one crap-table designed for playing games of chance for money and property. The court said:

"A further contention is that the game of poker cannot be played by means of a table alone, but that the thing that is adapted, devised and designed for the purpose of playing such game is an ordinary deck of playing cards. The primary object of the statute was to prevent gambling, by prohibiting the setting up or keeping any kind of table or gambling device for the purpose of playing any game of chance for money or property, and, although cards or dice may be necessary to be used in conjunction with such table or device in order to play such game of chance, it is none the less a gambling-table or device when used in conjunction with cards or dice for the purpose of playing a game of chance for money or property. *State* v. *Rosenblatt*, 185 Mo. 114, 83 S. W. 975; *State* v. *Locket*, 188 Mo. 415, 87 S. W. 470."

Additional authorities might be cited in numbers, but those used throw light upon every phase of the matter before us, and I shall stop.

The laws against gaming in this state are very broad and comprehensive. Most of the states in providing for the punishment of gaming commonly specify such games as would under accepted rules of construction restrict the criminal penalties to the specific games mentioned and to others which were similar. The statute of Arizona is not of this character, and, so far as I am aware, section 321 of the Penal Code has no counterpart in any other jurisdiction. If it be more comprehensive in its restriction than is desired, the policy of its repeal or amendment is a matter that must receive the attention of the law-making power. With the wisdom of its policy the courts have nothing to do. An act entitled, ''An act to create a state racing commission and to regulate and control horse-race meetings, and authorize the use of the pari mutuel system where horse-race meetings are conducted,'' was passed by the last legislature. The Governor, however, disapproved the measure for reasons satisfactory to himself and it did not become a law. No doubt, those to whom the privilege might be given to operate this kind of a pooling scheme for public betting would derive a large revenue therefrom, just as a concession in any other form that would minister to the passion and weakness of men, or to their folly and gullibility, would bring big returns.

It is probably not contemplated that a fair association whose corporate life has been granted by the state, and which is under the control of public officers, should claim the right to authorize and rent a place for gambling at the fair grounds. In the absence of specific legislation this would be somewhat novel. But, nevertheless, those persons whose tastes and wishes can be gratified only by this species of public gambling at race-tracks must find relief in legislative action, for no right-thinking person would like to see the odious spectacle of the courts of his state pioneering in the path of legislation that must be left open exclusively to another branch of the government. Such an undertaking will inflict a wound upon the law which nothing can heal, for one step in this respect opens the door for others which are sure to follow. The public policy of this state must be announced by the law-

making power, not by the courts.   The duty of the courts is *jus dicere*, not *jus dare*.

That the use of the pari mutuel machine requires the intervention of other agencies does not acquit the defendant.   He adopted those agencies as a part of his plan or scheme in violation of the law, and he may not be relieved of the penalty by any such subterfuge as is shown in this case.

A judgment should be entered dismissing the appeal because the proceeding is sham.   If the appeal is entertained, however, this court should cut at its root and substance, unfrock it of the mechanical parts, ignore the dead wood and the shadow of dry legal rules, and look broadly at the stipulated facts.   Our vision of the forest must not be obscured by a tree.

As apropos of the gaming laws of Arizona, the remarks of Mr. Blackstone made on a *résumé* of the common-law and statutory provisions of England pertaining to gaming may be quoted with profit.   Said the great commentator:

"Thus careful has the legislature been to prevent the destructive vice: which may show that our laws against gaming are not so deficient as ourselves and our magistrates in putting those laws into execution."   2 Cooley's Blackstone, p. 1344.

While I am convinced that a judge, when he wishes to air his individual opinions of the law, ordinarily should be willing to pay for the same at the current advertising rates, and not aid unduly to stuff these "fellows in buckram," nevertheless, in palliation of such prolixity, I can only say that my Brothers have grievously erred, and grievously have I gibbeted the error.

In this wise, and in the light of our statutes and the adjudicated cases, the judgment of conviction ought to stand.

I therefore dissent.

----

Authorities passing on the question whether a turf exchange is indictable as a banking or percentage game are collected and discussed in notes in 7 L. R. A. (N. S.) 899; 33 L. R. A. (N. S.) 828.